STATE of Missouri, Respondent,

v.

Diana Lynn GATES, Appellant.

No. 32721.

Missouri Court of Appeals,
Western District.

June 22, 1982.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Aug. 3, 1982.

Application to Transfer Denied
Sept. 13, 1982.

James W. Fletcher, Public Defender, Sean D. O'Brien, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Melinda Corbin, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The defendant Gates was convicted by a jury of stealing [§ 570.030, RSMo 1978] and was sentenced to a term of five years. The appeal contends that the information was not a sufficient charge of offense and other points of error.

The victim Abston was an eighty-five-year-old male who was attacked in his home by two females and relieved of $200 in cash. Earlier that day, one of the females, Carol Lloyd, [already known to the victim but not by name] came to the home, told Abston that she was out of work and requested financial help. He offered her the use of one of the apartments on the premises until she found employment and gave her $5. She then left but returned some thirty minutes later with a person she introduced to Abston as her sister. They remained with him on the premises some fifty minutes, talked and drank soda pop together. Throughout this time the other female [identified at the trial by the victim as the defendant Gates] was within the presence of the man, never more than fourteen feet away. She was distinctively tall [described by the victim at the trial as nearly six feet in height]. At a time when Abston turned his back, the defendant struck him on the head with a soda pop can, wounded him above the eye and bloodied his nose. A scuffle ensued among the three. Abston heard one female say, "Did you get it?" and the other reply, "Yes." The females departed immediately and Abston discovered that his pocketbook with $200 was missing from the hip pocket.

The victim described the assailants as [# 1] a white female, 23 to 24 years old, short, about 125 pounds thin and blond, and [# 2] as a white female, 26 to 27 years old, tall, 142 pounds, medium in stature and with black hair. The police interviewed the victim again, this time in the presence of his friend Betty Sariano. Abston told the police he thought the assailants were sisters and that one of them [suspect # 1] was an acquaintance of his friend, Ms. Sariano. A

complaint was filed against Carol Lloyd and the other. Three days later, they were taken into police custody. They were placed in a lineup and Abston identified them from the display. That identification was suppressed on the ground that the defendant was seized without probable cause. The court found nevertheless that there was an independent basis for the trial identification of the defendant by the victim and allowed that evidence.

■ The defendant contends first that the conviction may not stand because the information fails to allege ownership of the property stolen—an essential element of the crime of stealing under § 570.030 [Laws 1977, effective January 1, 1979].

That statute prescribes:

A person commits the crime of stealing if he appropriates property or services of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion.[1]

The essential elements of offense are (1) an appropriation (2) of property or services (3) of another (4) with the purpose to deprive that other of the property or services (5) accomplished without the consent of the other [or by deceit or by coercion]. *See* The New Missouri Code, Manual for Court Related Personnel § 15.3 (1978). The definitions, among the others, to be accorded these component terms of offense are delineated in § 570.010:

As used in this chapter:

(3) *"Appropriate"* means *to take . . . possession* of;

\* \* \* \* \* \*

(10) *"Property"* means anything of value, whether real or personal, tangible or intangible, in *possession* or in action,

\* \* \* \* \* \*

(9) *"Of another"* property or services is that "of another" if any natural person . . . other than the actor, has a *possessory or proprietary interest therein . . . .* [emphasis added]

The contention of the defendant assumes a parity between the proscriptions of former stealing § 560.156 and code § 570.030. The now discarded § 560.156, however, was an offense against ownership in the traditional common law sense so that an averment of ownership of the property was essential to a lawful charge. *State v. Cantrell*, 403 S.W.2d 647, 650[7–11] (Mo.1966). The code § 570.030 now constitutes stealing as an offense against both ownership and property in lawful possession of the other. § 570.030 and § 570.010, definitions (3), (9) and (10). That is, the stealth of the *property of another* which the code [§ 570.030] interdicts and punishes is "any property in which someone other than the actor has a *proprietary or possessory* interest." [emphasis added] § 570.010, Chapter Definitions, Comment to 1973 Proposed Code (9); The New Missouri Criminal Code, Manual for Court Related Personnel § 15.1, p. 15–4 (1978).

■ The code makes transition from the multifarious common law definitions [larceny, larceny by bailee, larceny by false pretenses, embezzlement, among the others— each with distinctive essential elements][2] to one basic and encompassed crime. The exclusive source of reference to determine the essential elements of the crime of stealing, therefore, is code § 570.030 itself, and not any prior enactment or common law variant.

■ The information does not aver that the victim Abston *owned* the property

---

1. The conduct becomes punishable as a felony if the stealing involves a physical caption of the property appropriated from the person of the victim. § 570.030.2(2).

2. *See* The New Missouri Code, Manual for Court Related Personnel, § 15.3 Comments (1978).

We note that the requisite for an *averment of ownership* in the information to invoke juris-

diction to prosecute for stealing under predecessor § 560.156 notwithstanding, the *proof for conviction* was met by evidence that the person from whom the property was taken was in lawful possession. *State v. Barber*, 587 S.W.2d 325, 328[8] (Mo.App.1979); *State v. Hill*, 528 S.W.2d 798, 801[3, 4] (Mo.App.1975). These cases and others presage the code rationale of offense.

appropriated by the accused Gates. The inquiry remains whether the information avers that the property was appropriated from the *possession* of the victim Abston. The actual terms of formal accusation [after the preamble of the statutory sections which proscribe and punish the conduct] are that:

the defendant, Diana Lynn Gates, either acting alone or knowingly in concert with another, appropriated U.S. Currency, by physically taking it from the person of Otto Abston, and defendant appropriated such property without the consent of Otto Abston and with the purpose to deprive him thereof.

MACH–CR 24.02.1 formulates the model information for the crime of stealing [without consent] as defined by § 570.030.1. The accusation lodged against the defendant Gates conforms to that paradigm in every respect except to omit the averment *which said property was in the possession of* which MACH–CR inserts between *the person of Otto Abston* and *and defendant appropriated such property without the consent of Otto Abston.* The code crime of stealing, as we note, posits elements of an appropriation of property or services of another with the purpose to deprive the other, done without consent or by deceit or coercion. The offense, by very definition may be accomplished within or without the presence of the owner or person in possession, by caption of the property from the physical person or by simple concealment, among other means. The New Criminal Code, Manual for Court Related Personnel § 15.3, Major Changes (1978). The *mode* of the appropriation affects whether the stealing shall be punished as a class C felony or class A misdemeanor. The stealing is a class C felony if [§ 570.030.2(2)]: "The actor physically takes the property appropriated from the person of the victim." In any other mode of stealing, the property is not taken from the person of the victim and so, if ownership is not averred, the information must charge the element of offense [as in MACH–CR] *which said property was in the possession of* [the victim] or its equivalent. When the offense charges the class C felony

of stealing from the physical person under the subsection 2(2) component of § 570.030, however, the averment essential to that grade of stealing offense—*by physically taking it from the person of* [the victim]— amounts to an allegation that the *property was in the possession of* [the victim], so that the neglect to recite that averment, already stated essentially, merely avoids redundancy.

■ The information omits no essential element of the offense defined by § 570.030, albeit not rescripted in the precise MACH–CR terminology. *State v. Mitchell*, 611 S.W.2d 223, 225[1, 2] (Mo. banc 1981). The information sufficiently defines the offense, adequately informs the defendant of the charge to meet, and bars further prosecution for the same conduct. *State v. Downs*, 593 S.W.2d 535, 540[1, 2] (Mo.1980).

■ The court suppressed the lineup identification of the defendant by Abston on the ground that Gates was unlawfully seized by the police. Abston later at the trial pointed to the defendant then present as one of the assailants and thieves. The defendant contends that the evidence does not show that the memory of victim Abston of the defendant Gates as his assailant existed prior to the illegal lineup, but rather that the lineup encounter was so predisposed and suggestive as to irreparably taint the trial identification of the jury. The defendant made no objection to that trial evidence but contends that the prejudice from that testimony was so grievous as to constitute plain error.

The lineup was constituted some eleven days after the victim reported the assault and theft to the police. The defendant Gates and sister Lloyd were taken into custody on July 17, 1980, on a pickup order issued on the complaint of the victim Abston. That order [according to officer Wagoner] was accompanied by physical descriptions of the persons and apparel of the two suspects. The defendant Gates wore red shorts and a red shirt at the time of arrest—exactly as the dispatch order described. It is not conclusively apparent how

that description evolved or when it became a component of the pickup order. There was testimony by officer Grosko that three days before the arrest [on July 14, 1980] after an interview with the victim the initial pickup order for the arrest of the # 2 suspect [Gates] issued without other description than "a white female." There is no explanation, however, why that description was not more ample. Abston, on the first police interview on July 6th—immediately following the criminal event—described the [# 2] suspect as tall, 142 pounds in weight, medium build, with black-colored hair. Abston then told the police also that the suspects were sisters, and that although he did not know the name of the # 1 suspect [Carol Lloyd, identified to them by separate description], he had seen her before in the company of Ms. Sariano, a female friend close to him. The subsequent interview by officer Grosko [on July 14, 1980] of Abston, after which the initial pickup order issued, was conducted in the company of Ms. Sariano. The description of the # 2 suspect which Grosko recorded upon that interview was of a white female, *short*, 23 to 24 years of age, thin build, and *blond* hair. The defendant contends that these confounded descriptions demonstrates that Abston had no reliable memory of the second assailant and was prompted to select the defendant from the lineup only because the array of persons was unduly suggestive.

The argument is a contradiction. On the one hand, the defendant contends that the July 14, 1980, description of the # 2 suspect as a *short* female is at odds with the July 6, 1980, description as a *tall* female—and so shows an uncertainty as to whether she was short or tall. On the other hand, Gates contends that the lineup array which displayed the six-feet-two-inch defendant among three other females—none of them

taller than five feet seven inches—so pronounced her tallness as to predispose the identification. We note first of all, that the evidence allows inference that the description of the # 2 suspect as a *short* female with *blond* hair was attributable to Ms. Sariano, and not the defendant.[3] Every direct account by the victim described Gates as a tall female. The investigation reports related by the officers, both on the pretrial motion to suppress the identification and on the trial, uniformly note that the victim declared he would know suspect # 2, not only by the distinctive frame, but by her facial features. And, in fact, at the lineup, Abston without hesitation and without other aid picked Carol Lloyd and Diana Gates as the assailants from among the array of four women. He went by the "looks on their faces," and identified the defendant Gates, particularly, by "the expression and look on her face, that's all, and the height."

The defendant complains that the identification choices were predisposed by even other factors. She contends that Abston was summoned by the police to the lineup by a letter which informed him that "they had them in jail." She contends also that after the lineup identifications were made, the police told him: "Yes, you picked the right ones." The defendant does not say how the affirmation of right choice *after* the identifications could have predisposed the identifications. Abston did testify on the motion to suppress that he was notified to the July 17, 1980, lineup by a police department letter, and that the letter contained information that "they had them in jail." The validity of that excerpt as a declaration of fact is doubtful. The context is so ambiguous, that when considered with other established facts, the inference that there was a *letter* of notice at all, dissipates.[4] There was police officer testimony

---

**3.** In fact, defendant Gates measured six feet two inches in height.

**4.** "Q. Before you went in there [the lineup] did the officers tell you that they picked up two people?
A. Oh, no, no, he didn't tell me nothing like that.

Q. What did he say?
A. I knew that they had them in jail.
Q. How did you know that?
A. Well, I don't believe I can answer that question correctly.
Q. What would be the problem?

that upon arrest of a suspect the practice was to telephone the victim "and try to get them down as soon as possible . . . If we can't contact them by phone, we send district cars to try and pick them up." The exigency does not allow time for a letter. The evidence was that Lloyd and Gates were taken in arrest on July 17, 1980, at 9:27 a. m. and that the lineup was conducted at 1:00 p. m. that same afternoon. Abston, as the victim, viewed that lineup. The inference is inescapable that the notice to him for that purpose was other than by letter. The conclusion that Abston was oriented to identify Gates by an unduly suggestive police letter, therefore, is only speculation.

 The defendant argues also that a lineup composed of four females—one of them significantly taller than the rest—exhibited to a victim with the presentiment that two of the array were the perpetrators of the offense against him was unduly suggestive. The law protects against those lineup procedures which tend to the substantial likelihood that a misidentification will result. *State v. Dayton*, 535 S.W.2d 479, 488[12] (Mo.App.1976). That the victim is called to view a lineup at all implicitly suggests that one or more of those exhibited may have committed the crime. *State v. Gregory*, 630 S.W.2d 607, 609 (Mo.App. 1982). That one among the array is marked by a physical feature more prominent than that of any other—such as an unusual height—does not necessarily invalidate an otherwise fairly induced identification. *State v. Abrams*, 597 S.W.2d 230, 232[5–7] (Mo.App.1980). That one of the females in the lineup display [Lloyd] is already known to the victim as a suspect and remembered as an accomplice of a tall female, also a suspect on display [Gates] does not, in itself, induce an undue suggestion that the tall female was, in fact, the accomplice and so unreasonably risk a misidentification. It is only a pretrial confrontation procedure which risks " 'a very substantial likelihood of irreparable misidentification' " so as to " 'undermine the reliability of the eyewitness identification' " [*State v. Charles*, 612 S.W.2d 778, 781–2 (Mo. banc 1981) ] that violates due process.

 The question remains, therefore, whether the prelineup eyewitness identification was sufficiently reliable as an independent source for the trial identification—or, as defendant puts it: whether "Abston's memory of [Gates] as his robber existed prior to the illegal lineup" which [we add] was not undermined by that illegality. That reliability is established by factors, within the full circumstances, of the opportunity of the witness to view the criminal at the time of the event, the degree of that attention, the accuracy of the prior description of the criminal, the degree of certainty shown by the witness at the confrontation and the length of time between the criminal event and the confrontation. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *State v. Higgins*, 592 S.W.2d 151, 160[13, 14] (Mo. banc 1979). The victim was in the company of the two females for about fifty minutes. The room was well lighted. The defendant moved around the room, but never more than fourteen [or, by another account, twelve] feet away from the victim. They were often within one foot of each other. The opportunity to observe was open and prolonged. The victim gave them both his continued attention. The eyesight of the eighty-five-year-old victim was not perfect, but he could read and "see all right." The eleven days between the eyewitness confrontation during the events of the crime and the lineup was hardly a lapse sufficient for memory to fade. That element does not, alone, affect the reliability of an identification—and, in this case, the circumstances show that the recollection of that initial encounter was vivid and immediate. *State v. Charles*, supra, l.c. 780[1, 2].

The descriptions Abston [distinguished from Ms. Sariano] gave unaided to the po-

A. I don't know who told me that they had them in jail. I got a notice through the mail that they had them in jail."

lice were consistent and accurate, although not detailed. He selected both females from the lineup with certainty and directly. Abston identified the defendant at the trial confrontation with the same sureness and promptness. There was some variation between the lineup and the trial descriptions of the hair of the suspects. Immediately after the crime, Abston told the police the # 1 suspect [Lloyd] was a blond and that the # 2 suspect [Gates] had black hair. On the date of the lineup [July 17], eleven days later, Abston confirmed those descriptions. He reiterated those attributions of hair color at the pretrial motion to suppress the lineup identification. Then, at the trial, Abston gave as his recollection that he had told the police the tall suspect [defendant Gates] was neither blond nor black of hair, but more nearly "sandy"; and that Lloyd was blackhaired, not blond. The defendant argues that the "sandy" description—as the photographic exhibits reveal—is more nearly true. Thus, these inversions of physical descriptions demonstrate that Abston had no independent memory of Gates from the assault encounter but that he settled on the hair description [and, presumably the identification of her full person] from the lineup view. The basis for the trial identification, concludes the defendant, rests on no other source than the illegal lineup and so was not proper evidence. The record contains no definitive color description of the hair of the defendant on trial. The photograph of the lineup array depicts Gates with darkish hair.[5] The testimony by witness Sariano, who had some acquaintance with Gates, described her hair to the police as blond. The acuity of women in these matters is of some account. The evidence allows inference both, that the hair color descriptions by Abston was not a discrepancy between observation and memory, but that "dark" and "sandy," each, is verisimilar and—the common practice of women to alter the hue of the hair from time to time considered—that the Sariano description was also accurate.

 The evidence does show some discrepancy in past details—such as, how much time passed before the police responded after the crime and the precise amount of money taken from him. At the time of trial, Abston was still in recuperation from an eye surgery administered after the crime, his health was poor and he complained of a dizzy head. The inconsistency in the testimony went to credibility, and not to the competency of the identification. *State v. Williams*, 566 S.W.2d 841, 845[11, 12] (Mo.App.1978). The trial identification given by Abston was reliably recalled from the prolonged and open eyewitness observation of the defendant at the criminal encounter untainted by the illegal arrest or an otherwise unduly suggestive lineup. The admission of that evidence was not plain error.

 The defendant complains next that the admission of police witness testimony that the females Lloyd and Gates were sisters was erroneous hearsay and prejudicial. Whatever the merit of contention otherwise, that evidence was only cumulative to the testimony of the victim Abston, already received without objection, that Lloyd had introduced the other female to him as her sister. The error, if any, was harmless. *State v. Fingers*, 564 S.W.2d 579, 583[8, 9] (Mo.App.1978). The defendant contends, however, that [within the rule of *State v. Degraffenreid*, 477 S.W.2d 57 (Mo.1972)] evidence only cumulative may yet be prejudicial where the record does not show that the jury could not have been influenced by that erroneous evidence. In this case, the defendant argues further, the identification by the aged victim was made doubtful by infirmity of sight and memory—as the several incongruities of his descriptions and recollections attest—so that the testimony by officers Stewart and Grosko that the victim told them the suspect was the sister of the known assailant Carol Lloyd was decisive to influence the jury as to the truth of that assertion. That hearsay evidence, however, was accepted by the defendant at the trial so as to dispel the operation of the *Degraffenreid* principle—whatever otherwise the merit of contention.

**5.** That pretrial motion to suppress identifica- tion exhibit, however, was not before the jury.

The two police officers, Stewart and Grosko were called as witnesses on the liminal motion to suppress the lineup identification. They were called as witnesses for the *defense*, however, at the trial. Officer Stewart responded to the call from Abston immediately after the assault and stealth of July 6, 1980. He interviewed Abston and wrote a report of the investigation. In the course of his testimony, officer Stewart was encouraged by the defense to consult the report to refresh recollection. The tenor of testimony indicates that his responses were entirely from the report: the time of arrival, the physical state of the victim, the account of the crime by victim Abston, the nature of the physical evidence of crime, and the descriptions of the suspects given by Abston—among other details. The direct examination by the defense concluded with the query and response:

"Q. So is it right to say that the information that is reported here on this piece of paper as far as suspect description is a total of what you got?

A. Yes."

The prosecution cross-examined the witness Stewart as to the descriptions given the officer by Abston on that occasion and concluded that trend of inquiry with the question:

"Did he give you any other information that might have been helpful in identifying the two suspects?"

To which [after the court overruled objection that question was without proper foundation as to the blood relationship] the witness responded:

"Mr. Abston stated that he believed the number 1 suspect [Lloyd] was an acquaintance of his girlfriend, Betty Sariano, and further stated that both suspects were sisters."

The defendant contends on appeal, as on the trial, that the evidence by Stewart was without sufficient foundation. The defendant made no hearsay objection, and the foundation as to the blood relationship between the suspects was already properly in evidence from the victim, himself. In any event, it was the defense which used the

police report as the source for the evidence of the witness [albeit as a refreshment of recollection] and the prosecution was entitled to exploit other entries to discredit the previous testimony on the subject, that the descriptions narrated on direct examination "is the total of what [Stewart] got." *State v. Lue*, 598 S.W.2d 133, 138[8, 9] (Mo. banc 1980). The defense made much of the imperfect, sometimes variable, physical descriptions given by the victim to the successive officers. The report by the victim to the officer that the known assailant introduced the unknown assailant as her sister was an element of the description of that suspect and a legitimate subject of cross-examination on a subject initiated by the defense questions. *State v. Holmes*, 419 S.W.2d 15, 17[1, 2] (Mo.1967).

The other testimonial source of the sororal fact, admitted as evidence and contended as hearsay error, was officer Grosko, called as a witness by the defense. Grosko testified for the prosecution on the pretrial lineup motion. He was not amenable to process at the time of trial, so the defense used the motion in limine transcript as evidence [as modified by portions excluded by the court on objection of the defendant]. The court allowed over the hearsay objection of the defendant, however, the Grosko transcript testimony of the Abston descriptions of the assailants—which included the assertion that they were sisters. The defense inquiry continued:

"Q. The party Mr. Abston was vague in regard to is the one described as white female, short, twenty-three to twenty-four years old, thin build, and brown hair?

A. That is the party that he was vague, too, and *that is the party that Betty Sariano was referring to as the sister by the name of Diana, and she was describing this sister.*" [emphasis added]

The defendant argues that the Grosko iteration of the Sariano surmise that the suspect [otherwise only vaguely described by Abston] was the sister of the known assailant [Lloyd] was not only the hearsay of

**288**

nonwitness Sariano, but evidence of such effect as calculated to persuade an otherwise doubtful jury as to the identity of the second assailant. The defendant contends that the evidence, although cumulative on the issue of identification, was clearly prejudicial and that *Degraffenreid* requires reversal. The argument is undermined by a simple fallacy: the *entire* Grosko testimony—with minor exception—was nothing more than a narrative of what he learned from Ms. Sariano [albeit it was his purpose to interview Abston] concerning the identities of the two suspects.[6] The officer testified as to numerous details of description information given by Sariano as to *both* suspect Lloyd and the second female suspect. That testimony, *all* hearsay, was part of the defense evidence. The defendant complains that the hearsay Sariano attribution of sistership between the assailants *only* was erroneous evidence. That facet, however, was an integer of the full identification information known by Sariano and conveyed to the police and so was relevant to the subject opened by the defense evidence. *State v. Wood*, 596 S.W.2d 394, 402[19–21] (Mo. banc 1980).

█ The next point relates to final argument. The defendant impugned the credibility of the Abston identification of Gates as the second assailant. One point of attack was the discrepancy between the several descriptions given by Abston of the color of the Gates hair:

"Now, the hair then you see of the second suspect goes from black when it was originally given to Officer Stewart, to blond a week later when it was given to Grosko, to dark when it is given to Lonkausky, to sandy when it comes to Court."

The prosecutor responded in argument that "If you will observe the head hair on this young lady [defendant Gates], you will see

that it has been dyed." The argument then commented [presumably, to demonstrate the prior premise] that the roots of the Gates hair were darker than the rest of the hair. The prosecutor then surmised that the purpose of the hair color change was to avoid capture for the crime. The defendant argues that there was no evidence that Gates changed the color of her hair and so the argument was error and prejudicial. We do not reach the merit of the contention. The objection by the defendant came after the argument of the prosecutor on the subject ran its course and was untimely. The objection came only after the contention that Gates' changed hair color was stated, restated and stated again. The impropriety was waived. *State v. Laususe*, 588 S.W.2d 719, 721[8] (Mo.App.1979).

█ The final point contends that the refusal of the trial court to declare a mistrial or to allow additional voir dire of the veniremen after the close of inquiry, but before the selected jury were impaneled was prejudicial error. It came to the attention of counsel for defendant during the recess for peremptory challenges that the front page of the local newspaper displayed a news article: "Preying on the elderly: Woman, 80, is beaten." The publication was a news story about an elderly woman who was beaten and relieved of money by a male attacker. Counsel reported the discovery to the trial court immediately upon recontinuance and, on the premise that the facts in the news report were so similar to those in the prosecution, counsel requested for an additional voir dire to probe the potential prejudicial effect on any of the panel who might have read the newspaper account. The news item, now a part of the record, reports a serious rise in strong-arm robberies against the female elderly—and, in the case of the news report subject, perpetrated by a young male. The court

6. The pretrial testimony of officer Grosko—transcribed for trial use by the defendant—commences with the question: "And who did you make contact with there? [at the Abston residence]" and with the answer: "I contacted the victim himself, Mr. Abston, and another party by the name of Betty Sariano." The direct examination of the officer concluded with the question: "Based on your interview of Sariano and Abston, did you take any action?" and with the answer: "Yes. On information received, I went back to police headquarters and checked the files for a Carol Lloyd ... I put out a pick-up order so we could show her in person."

prefaced refusal of the request with the comment that he had, in fact, read that article in the morning newspaper and found none of the content prejudicial to the case on trial. The court explained: "The various publications are full of stories about different types of crime and there is nothing at all about this case and if we are going to try to avoid trying a case when there is never any publicity about certain type of crime, we might not ever get to trial." No doubt, media reports about crime abound to the extent that crime itself does. In a free society such reportage is not only inevitable, but essential to an informed public. The news report the defendant contends was a source of potential prejudice, once read, may engender repugnance against such a crime—especially where the victim is elderly and so more vulnerable—but that does not disqualify such a venireman from jury service if he can render decision according to the evidence. *State v. Williams*, 630 S.W.2d 117, 119[1] (Mo.App.1982). The trial court controls the voir dire process and that authority—the specific questions counsel may ask, included—exercised with discretion will not be disturbed unless abused. *State v. Lumsden*, 589 S.W.2d 226, 229[9] (Mo. banc 1979). The newspaper article posed no especial threat of prejudice not otherwise implicit in the reportage of the quotidian press. It was open to the defendant to probe that subject in the course of the regular voir dire inquiry. Counsel chose another way. There was no response to the prosecution inquiry whether any other reason, than those already delved, would prevent an impartial decision on the evidence. We may assume there was none.

The judgment is affirmed.

All concur.