STATE of Missouri,
Plaintiff-Respondent,

v.

Bobbie Gene STUCKEY,
Defendant-Appellant.

No. 65999.

Supreme Court of Missouri,
En Banc.

Nov. 20, 1984.

John E. Cash, Kansas City, for defendant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

BLACKMAR, Judge.

A jury found the defendant guilty of capital murder and fixed the sentence at life imprisonment without probation or parole for 50 years. The Court of Appeals, Western District, reversed because of the failure to give an instruction about the defendant's wife's right to use force in his defense, and found it unnecessary to consider other allegations of error advanced in support of a claim for new trial. We granted the state's motion to transfer and, taking the case as on initial appeal, now affirm the judgment of the circuit court.

The defendant does not challenge the sufficiency of the evidence, even though the prosecutor's case is essentially circumstantial. Because the sufficiency is not questioned we do not need a lengthy statement of facts supporting the verdict. Under the state's theory the defendant met Larry Wilson, the victim, at a sale barn in Mexico where he was trying to market a trailerload of pigs. Defendant suggested that Wilson could get a higher price elsewhere and drove with him to a farm in Monroe County. The putative buyer was not home. They then headed for Edina but stopped along the way. The defendant hit the victim a blow, possibly with a break-over bar, rendering him unconscious, and then placed him, while still alive, in the bed of the defendant's pickup truck, while defendant's wife drove the victim's truck with the hog trailer attached. The defendant stopped along a gravel road, shot the victim in the head, and left his body in a

wooded spot. The couple headed for Centerville, Iowa, where they sold the pigs but did not receive the money because they could not produce evidence of ownership. The defendant at one point after his arrest, said to the sheriff holding him in custody, "I killed him but I didn't mean to."

## I.

The case was submitted to the jury under MAI–CR 15.02, reading as follows:

If you find and believe from the evidence beyond a reasonable doubt;

First, that on or about May 29, 1981, in the County of Shelby, State of Missouri, the defendant caused the death of Larry L. Wilson by shooting him, and

Second, that the defendant intended to take the life of Larry L. Wilson, and

Third, that the defendant knew that he was practically certain to cause the death of Larry L. Wilson, and

Fourth, that the defendant considered taking the life of Larry L. Wilson and reflected upon this matter coolly and fully before doing so, then you will find the defendant guilty of capital murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

The court also gave MAI–CR 2.10, reading as follows:

1. A person is guilty of an offense if it was committed by conduct for which he is criminally responsible, whether that conduct was his own or that of another person or both his own conduct and that of another.

2. A person is criminally responsible for the conduct of another in committing a particular offense when, either before or during the commission of an offense, with the purpose of promoting the commission of that offense he aids such other person in planning and committing that offense.

A person is also criminally responsible for any other offense which he knew that such other person was practically certain to commit or attempt to promote escape or to prevent detection for the particular offense initially contemplated.

3. The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible therefore, although his presence may be considered together with all of the evidence in determining his guilt or innocence.

The defendant took the stand in his own defense and testified that he knew the victim casually and saw him at the livestock market in Mexico, Missouri on the morning of May 29, 1981. Observing that the victim had a load of hogs to sell, defendant told him of a buyer who would pay a higher price. The victim agreed to accompany the defendant to the potential buyer's home.

The defendant and his wife, followed by the deceased, drove to Monroe County to see the buyer. Nobody was home. The trio then headed for Edina, Missouri, upon defendant's suggestion that a good price could be obtained there. This trip was abandoned due to tire problems on the victim's livestock trailer. The lug nuts attaching the tire to the rim kept coming loose. We now make use of the Court of Appeals' summary of the defendant's testimony.

Around 2:30 p.m. the trio stopped at the entrance to "Grange Park" to once again tighten the "lug nuts". The victim parked his pickup truck and trailer partly on and partly off of the traveled portion of the road on the east side, and defendant parked his pickup truck in the entrance to "Grange Park". Tempers had been building up and the victim had become "aggravated" because the "hogs were becoming hot" and he was "afraid they were going to overheat". He was also put out because it appeared he wasn't going to get his hogs sold that day and was going to have to hold them over the weekend. After the victim tightened the "lug nuts" with a "breakover" bar, he stood up and turned toward defendant. The victim, as he turned towards defendant, drew the "breakover"

bar "in a backward motion." The "breakover" bar was in the victim's right hand. Defendant, thinking the victim was going to hit him, grabbed the victim's right hand. A struggle then occurred between the two with each trying to throw "punches" at the other. During the struggle they fell to the ground, with the victim landing on top of the defendant. While the victim was on top of him, defendant heard his wife "hollering". The next thing defendant heard was a "shot". Immediately after the shot the victim "lunged" over into a ditch. Defendant then looked up and saw his wife "standing there". Defendant asked her why she shot the victim and she replied "I thought he was going to hurt you." His wife shot the victim with a .22 caliber rifle which had been in a gun rack in their pickup truck. The victim was 6 feet, 2 inches tall and weighed over 200 pounds. Defendant was 5 feet, 8 inches tall and weighed 150–155 pounds.

Defendant went over to where the victim was lying and felt his pulse. He thought he felt a slight pulse and told his wife to go get an ambulance. About that time defendant heard a car coming and stared toward the road. The approaching car, occupied by a man and woman, stopped and defendant told them "there was a man hurt real bad and they needed an ambulance." The couple told defendant they would call an ambulance and left.

After the couple left defendant went back to where the victim was lying and at that time determined that he was dead. Defendant told his wife she had killed the victim. His wife "went all to pieces" and said they would "throw her in jail" and he "had to do something". Defendant tried to calm his wife down and told her he "would think of something". Defendant then dragged the victim over to his (defendant's) pickup truck and put the body in the truck bed. Defendant then told his wife to get in their pickup truck and "let's get out of here". Defendant's wife refused to get in the pickup as long as the victim's body was

there. He told her to take the victim's pickup truck and trailer and head towards Highway 15 and he would catch up with her. Defendant's wife left ahead of him, but he passed her on Route AA east of the "Ridge Bridge". Defendant turned off of Route AA on a side road near the Ridge Bridge and dumped the victim's body at the place where it was later found.

Defendant caught up with his wife and they took both trucks and the livestock trailer to Edina. He then had no intention of stealing the hogs, but his wife convinced him to sell them so the couple would have "getaway" money. While in Edina defendant washed his truck to clean the blood out. He and his wife then traveled to Centerville, Iowa, where they sold the hogs but did not receive payment because they lacked proper identification.

They left Centerville with both trucks and the trailer. The trailer was abandoned south of the Iowa line. The victim's pickup truck was set afire near Lancaster, Missouri.

Defendant denied that he told the Sheriff of Shelby County "I killed him, I killed him, but I didn't mean to." He also denied that he shot the victim or aided and encouraged his wife in the shooting.

The defendant did not request any converse of Instructions 5 or 10. Nor did defendant request an instruction submitting a "special negative defense." He now argues, nevertheless, that the trial court committed reversible error by not instructing the jury that his wife had the right to use force in his defense. It is suggested that an instruction could be adapted from MAI–CR2d 2.41.2 in substantially the following form:

One of the issues in this case is whether the use of physical force against Larry Wilson was justifiable. The use of physical force, including the use of deadly force, is justifiable if used in lawful defense of another person. On that issue you are instructed as follows:

1. The State has the burden of proving beyond a reasonable doubt, either that Defendant shot Larry Wilson as submitted to you in instructions 5, 6, 7, 8, and 9, or, if Mitzi Stuckey shot Larry Wilson, that Mitzi Stuckey did not act in lawful defense of another person. If the evidence in this case leaves in your mind a reasonable doubt as to whether Mitzi Stuckey shot Larry Wilson, and in so doing acted in lawful self defense, then you must find the defendant not guilty.

2. If Mitzi Stuckey reasonably believed it was necessary to use deadly force to protect Defendant against what Mitzi Stuckey reasonably believed to be the use of unlawful force putting Bobbie Stuckey in imminent danger of death or serious injury at the hands of Larry Wilson, then Mitzi Stuckey acted in lawful defense of another person and Defendant Bobbie Stuckey must be acquitted.

3. In determining whether or not Mitzi Stuckey acted in lawful defense of another person you should consider all the evidence in the case.

4. If Mitzi Stuckey reasonably believed it was necessary to use the amount of physical force she used in order to protect Defendant, it is of no consequence that the appearances turned out to be false. If Mitzi Stuckey acted in lawful defense of another person, as submitted in this instruction, Defendant must be acquitted even though there was no purpose on the part of Larry Wilson to kill or seriously injury (sic) Bobbie Stuckey, and no immediate danger to Bobbie Stuckey, and no actual necessity to use such physical force as Mitzi Stuckey used.

The state argues that the "defense of a third person" instruction was not required because Instruction No. 5, the verdict director, required the jury to find that the defendant himself committed each of the acts required to be found in order to convict. This position is undermined by the submission of Instruction No. 10, which provides a basis for conviction even if the jury found that the defendant's wife had shot the victim. The prosecutor further undermined the basis for the state's present contention by arguing that the jury did not have to find that the defendant actually fired the fatal shot. The instructions are somewhat confusing as to whether the defendant could be found guilty on account of a shot fired by his wife, but we find no reversible error.

▪ The Court of Appeals held that the failure to submit the special negative defense instruction requires reversal, relying on *State v. Quisenberry*, 639 S.W.2d 579 (Mo.banc 1982) for the proposition that an accessory may not be convicted of an offense of a greater degree than the principal was guilty of. We do not agree. Two conditions are needed for a reversal when error is claimed because of failure to submit an instruction which was not requested: First, the instruction must be essential to the proper submission of the case and, second, the omission must be prejudicial. Neither requirement is met in this case.[1]

▪ The jury, if relying on Instruction No. 10 to convict the defendant on account of a shot fired by his wife, would have to find that the defendant aided her in promoting the commission of the offense, and that he knew that she was "practically certain to commit" the offense. The defendant's testimony negated any such finding. If the jury accepted his testimony, it could not make the findings required by Instruction No. 10, or Instruction No. 5. A verdict of not guilty would have to be returned at least on the capital murder charge. The defendant did not need a special negative defense instruction if the jury believed his testimony, which it clearly did not. Failure to give the instruction, then, had no determinative effect on the verdict and does not warrant reversal.

---

1. Contrary to the assertion in the dissent, we do not agree that there was error in failing to instruct the jury on the defendant's wife's right to use force in his defense. We hold, rather, that there was no error because the instruction was unnecessary, for the reasons stated in the following paragraphs.

The conventional self-defense instruction is necessary in cases in which the defendant fires the fatal shot, because the jury could find all of the requirements of MAI–CR 15.02, and still could find that the homicide was justifiable because the defendant reasonably believed that the taking of life was necessary. Instruction on the special negative defense also is essential in a situation in which the defendant claims that he killed a person in lawful defense of another. The jury must be told that such killings are justifiable. No such instruction would be helpful in this case because the jury could not have found the required elements for a guilty verdict if it believed the defendant's claim that his wife shot Larry Wilson to protect her husband.

■ An analogy is found in the "sole cause" instruction which once was in regular use in negligence cases. MAI 1.03 recognizes that the "sole cause" formulation is redundant and unnecessary because the jury, if of the opinion that the sole cause of the damage is to be found in the negligence of another, cannot find for the plaintiff and against the defendant in accordance with the verdict directing instruction. An instruction should not be given, even if correct, if it is unnecessary.

■ *State v. Quisenberry, supra,* does not aid the defendant in its holding that an accomplice cannot be held to a degree of guilt higher than the principal's. By defendant's testimony, he was not an accomplice in murder, robbery, or otherwise. He claimed that his wife shot the victim and that the shooting was a complete surprise to him. Whether she was guilty of a crime or not, and the degree of her guilt, are immaterial. Had the jury believed defendant's testimony he could not be guilty of premeditated murder, either for his own acts or for those of his wife.

## II.

The defendant's brief alleges that there were inadequacies in the prosecution's pretrial discovery disclosures. There are essentially three objections, as follows:

(1) The prosecution did not advise the defense that an expert witness would express the opinion that the victim was not dead at the time abrasions on his back and bruises on his neck and head were inflicted, and that these were inflicted before he was shot;

(2) The court erred in allowing the expert to testify on rebuttal that in his opinion the wound to the head could not have been inflicted by a .22 rifle; and

(3) The court erred in allowing the expert to testify on rebuttal that the bullet causing the head wound could not have been fired from more than 6 inches away, because of the presence of tattooing. The expert expressed these opinions to the prosecutor during telephone conversations. It is conceded that the state furnished copies of all reports of examination by the pathologist.

The fact that there were abrasions and bruises on the victim appears in the pathologist's report, which was furnished to the defendant. Defendant's complaint is that he was not informed as to how this information would be used. The question is whether a prosecutor must disclose conversations relating to the use of information contained in documents previously released to the defense.

■ The rules do not require any such disclosure. The prosecution complied with Supreme Court Rule 25.03(A)(1) and (5), V.A.M.R. by making the pathologist's report available to the defense. The basic object of discovery is to afford the defense fair opportunity to prepare in advance of trial and avoid surprise. *State v. Sykes,* 628 S.W.2d 653 (Mo. banc 1982). Defendant had the opportunity to depose or interview the prosecution's expert or to submit the reports to an expert of his own selection. The prosecutor disclosed his general theory to defense counsel several days before the trial with the statement, "you do not bleed after you are dead". This statement should have alerted the defense attorney as to what the prosecution might contend. The testimony was not unfairly surprising. The prosecution is not obliged to

share its trial brief with the defense. Defense counsel is expected to make such reasonable investigation as is necessary after the required disclosures have been made.

■ The remaining testimony complained of came out on rebuttal. Defendant testified that a .22 caliber rifle was missing from the gun rack in his truck. On cross-examination, he stated that the shot was fired from several feet away. Although the expert's testimony about the caliber of the weapon and the distance from which the shot was fired was excluded from the state's case, on a finding of inadequate disclosure,[2] it was properly used for rebuttal.

The situation is analogous to *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Statements inadmissible against a defendant in the prosecution's case because of *Miranda* violations were found to be properly admitted for impeachment purposes. If a defendant testifies that certain facts occurred, the prosecution may present witnesses to refute that testimony. The substance of a rebuttal witness's tetimony does not have to be disclosed prior to the trial. A defendant's own statements which were not revealed pursuant to discovery may be used in rebuttal of the defendant's testimony. *State v. Barton*, 593 S.W.2d 262 (Mo.App.1980). There is no reason why an expert witness' statements should not be available for impeachment in the same manner. The prosecution is entitled to use any competent testimony to challenge the credibility of the defendant's testimony.

In contrast to *State v. Johnson*, 524 S.W.2d 97 (Mo. banc 1975), there is no showing that the defense committed itself to a particular theory, which was then refuted by the state's late disclosures. The opening statements are not set out in the transcript. The state disclosed its theories when the rejected evidence was offered. The defense then advanced its theories as

to the weapon and the distance, knowing that the state had evidence to rebut its claims. It would be unfair to the prosecution to allow the defense evidence to go unchallenged.

### III.

The defendant complains of three statements made during final argument. Objection to two of these was not made contemporaneously, but was deferred until the prosecutor had concluded his opening argument. At one point the prosecutor sought to answer the defendant's testimony that his wife had fired the fatal shot by responding "you know what she'll say. I didn't do it, he did." Shortly afterward the prosecutor referred to "losing another young life like Larry Wilson so that we will not have any other wives and children without fathers."

■ Complaints concerning the substance of closing argument call for immediate objection so that corrections may be made and appropriate cautionary instructions given. An objection made after the close of argument comes too late. *State v. Gates*, 637 S.W.2d 280 (Mo.App.1982). These statements, furthermore, surely fall far short of plain error. The statement about what the defendant's wife would claim cannot reasonably be read as an assertion that the prosecutor had special knowledge as to how she might testify. The comment about Wilson's wife and children, although better left unsaid, was not highly inflammatory in the context of the case. The trial court is vested with broad discretion in controlling arguments of counsel. A conviction will be reversed for improper argument only if it is highly likely that the argument had a decisive effect on the jury's determination. *State v. Wren*, 643 S.W.2d 800 (Mo. banc 1983), *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), cert. denied, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149, rehearing denied, 459 U.S.

**2.** We do not have to decide whether these exclusionary rulings during the prosecutor's case

were appropriate.

1024, 103 S.Ct. 391, 74 L.Ed.2d 520. We see no reason to disagree with the trial judge's disposition of the points implicit in his overruling of the motion for new trial.

■■■ A more troubling complaint is about the prosecutor's assertion, in rebuttal argument, that the blood found on the victim's glasses at the Grange Park location was the result of a nosebleed caused by a blow to the head. The defense had argued vigorously that there was no showing of a source of blood other than the gunshot wound and that the presence of blood on the glasses supported the defendant's claim that the fatal shot had been fired at Grange Park. The nosebleed theory was advanced to counter the defendant's claim. It is not supported by any expert testimony, but autopsy photographs were introduced showing blood from the nose. There was also circumstantial evidence that the victim was alive at the time he was dragged to the pickup truck. The prosecutor's argument that the blood on the glasses came from the victim's nose was appropriate under the evidence. *Cf. State v. Armbruster*, 641 S.W.2d 763 (Mo.1982). The argument is not prejudicially erroneous simply because there might be alternate hypotheses. *State v. Newlon, supra.* The jury was told in MAI–CR2d 2.68 that arguments are not evidence.

### IV.

■■■ The appellant complains of the introduction of evidence that *Miranda* warnings were given to him after he was arrested. It is improper to elicit testimony that *Miranda* warnings have been given and heeded, but there is no error simply in showing that the warnings were given. *State v. Lamb*, 468 S.W.2d 209 (Mo.1971). The defendant did not remain silent, either while in custody or at the trial. He spoke with the sheriff after receiving *Miranda* warnings, and, according to the sheriff, volunteered a statement that he killed the victim but did not intend to. The state was entitled to show that the defendant's statements were made voluntarily and that he

had been clearly advised that he was not obliged to make any statement.

The defendant has shown nothing requiring a new trial. The judgment is affirmed.

RENDLEN, C.J., and WELLIVER, HIGGINS, GUNN and BILLINGS, JJ., concur.

DONNELLY, J., dissents in separate opinion filed.

DONNELLY, Judge, dissenting.

The principal opinion apparently agrees it was error to fail to instruct the jury the defendant's wife had the right to use force in his defense. However, it holds that such error was not reversible because (1) the instruction was not essential to proper submission, and (2) the failure to instruct was not prejudicial to the defendant.

The law in Missouri has long been that justification for a homicide is a basic defense on which the court *must*, whether requested or not, instruct *as part of the law of the case. State v. Brinkley*, 354 Mo. 1051, 193 S.W.2d 49 (1946); *State v. Aitkens*, 352 Mo. 746, 179 S.W.2d 84 (1944). The use of force in defense of a third person is justified by reference to self-defense: "[w]hat one may do for himself, he may do for another." *State v. Grier*, 609 S.W.2d 201 at 203 (Mo.App.1980). The justification of the use of force in defense of a third person is similarly available to an accomplice, there being no authority for the view that an accomplice may be convicted of a greater crime than the principal had intent to commit. *State v. Quisenberry*, 639 S.W.2d 579, 584 (Mo. banc 1982). Accordingly, where an accomplice has raised the issue of the justification of the principal to use force in defense of himself or another, the court *must* instruct the jury on that basic defense *as part of the law of the case.*

The principal opinion asserts that the defense of justification is unavailable to the defendant because *his* evidence did not establish that he was his wife's accomplice. A defendant has no burden of establishing the state's theory before availing himself of a defense against it. Moreover, a de-

fendant's participation in an offense as an accomplice may be inferred by his conduct before, during or after the commission of the offense. *State v. Rollie*, 585 S.W.2d 78 (Mo.App.1979). Here, a jury could reasonably have inferred from the evidence of defendant's conduct that he was at least an accomplice in the robbery. To rebut such an inference, the defendant was entitled to his defense.

The principal opinion contends that the failure to instruct the jury on the wife's right to use force in the defense of another was not prejudicial to the defendant, because Instructions Nos. 5 and 10 yield the same result. However, Instruction No. 10, patterned on MAI–CR2d 2.10 [withdrawn effective January 1, 1983, a date subsequent to trial of this case], and No. 5, the verdict director, as a practical matter permitted the jury to find the defendant guilty of capital murder, even though it believed that defendant's wife, rather than defendant, actually shot the victim, without any instructional guidance as to whether she did so with or without a culpable mental state or whether defendant, independent of his wife, had a culpable mental state when she did so. The assertion that Instructions Nos. 10 and 5 are functionally equivalent to an instruction on the justification of the use of force in defense of a third person is erroneous. To excuse as unprejudicial any failure to instruct on a "special negative defense" on the ground that the jury, by its guilty verdict, necessarily found that the state proved all requisite elements set forth in its verdict directing instruction violates fundamental fairness.

I dissent.