**552**

**STATE of Missouri, Respondent,**

v.

**James GOFORTH, Appellant.**

**No. 52273.**

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 11, 1987.

Motion for Rehearing and/or Transfer
Denied Sept. 9, 1987.

Application to Transfer Denied
Oct. 13, 1987.

Melinda K. Pendergraph, Columbia, for appellant.

William L. Webster, Atty. Gen., Jatha B. Sadowski, Asst. Atty. Gen., Jefferson City, for respondent.

CRIST, Judge.

Appeal from a jury conviction for first degree murder, § 565.020, RSMo 1986, for which defendant was sentenced to life imprisonment without eligibility for probation or parole. We affirm.

Defendant raises two issues on appeal. He asserts the trial court committed plain error when it allowed the State to argue, in closing argument, "How many people does James Goforth have to kill before we do what is right?" He also asserts the trial court erred in sustaining the State's objection to defense counsel's attempt to argue in closing argument that the State should have done more extensive ballistic tests.

To put defendant's allegations of error in perspective we find it necessary to give a fairly detailed recitation of the evidence presented at trial by the State. Defendant did not testify and presented no other evidence at trial.

On the evening of November 6, 1985, defendant went to the Rendezvous Club in Leadington, Missouri, with some friends. During the evening, defendant and victim had an argument. Later, at approximately 1 a.m., defendant and Rick Webers left the club to talk. Victim came outside, and either swung at or slapped defendant pushing him into Webers. Webers pushed defendant back. Defendant jumped off the porch on which they had been standing. Defendant pulled a knife and threatened victim. Victim responded in kind. Webers took out his gun and fired it. He testified he was trying to get the attention of victim and defendant. The owner of the club called the police. Defendant ran off and apparently lost a shoe.

Friends of defendant left the club after the fight and picked up defendant. They testified he was "hyper" and that he wanted to find his shoe. They drove to a 7-11 in Leadington, arriving there at 1:15 a.m. Defendant went inside where he became belligerent to some police officers who were at the store. Defendant asked the officers why they hadn't been present when he needed them at the time of the fight. The officers informed defendant they didn't have jurisdiction at the Rendezvous Club. Defendant left the 7-11.

Defendant and his friends proceeded to a trailer park in Leadwood. Defendant went

to Larry Wisdom's trailer and asked to borrow Wisdom's car. Defendant told Wisdom that he had been run off the road and needed Wisdom's car to get medical attention for an injury to his foot.

Defendant drove Wisdom's car to his sister's home. There he borrowed his brother-in-law's .22 caliber rifle, ostensibly to go deer hunting. At trial defendant's sister testified defendant was drunk; her husband testified that while defendant may have had a couple of beers he did not think defendant was drunk. To explain the absence of his shoe, defendant told the couple that he had sprained his ankle.

After leaving his sister's home, defendant drove to the Conoco station in Flat River, arriving there at approximately 2 a.m. Defendant knew the people who were at the station at that time. He told them not to call the police, explaining he had a gun, had been in a fight at the Rendezvous Club and was going back there. Defendant said there was a shell jammed in the gun, and he offered $20 for help in unjamming the gun. They wouldn't help him, so defendant picked up a pen and went out to Wisdom's car where he sat for a little while before driving off.

At about 2:25 a.m., the occupants of a trailer located behind the Rendezvous Club, heard a noise, looked out the window and saw victim being supported by another man. Then that man came to the door asking for help and stating that defendant shot victim. Defendant was no longer in the area. The police were summoned.

At 2:40 a.m. defendant arrived at Tina Stokes' apartment in Flat River, where Stokes, her brother, and defendant's sister were staying. He was carrying a rifle. Defendant told Stokes he had just shot someone. When he described the person he shot, Stokes recognized victim. Stokes woke up defendant's sister, and defendant repeated his story. They woke up Stokes' brother and defendant again repeated that he had shot someone.

Defendant and Stokes' brother took Wisdom's car and went out for food. While out they were stopped by police and defendant was arrested. When they didn't return, Stokes went looking for them. She met the police at the Conoco Station in Flatriver. Upon learning of the arrest she took them to her apartment where defendant had left the gun.

■ In his first point relied on, defendant asserts it was plain error to allow the State's closing argument. He alleges the argument "impaired [defendant's] right to a fair and impartial trial ... in that the argument went outside the evidence adduced at trial, constituted a comment on [defendant's] bad character and his propensity to commit future crimes." Defendant's attorney did not object to the argument either at trial or in the motion for a new trial. We find no plain error. Rule 30.20.

It is informative to view the complained of argument in context:

> Ladies and gentlemen, I'm not going to cry out for sympathy or pathos or any of this stuff when it comes to the death of [victim].... I'm going to tell you that you have a duty.... [Defense attorney] said you had three choices. I tell [sic] you do not. When you search your own conscience and you do what you know you have to do, because you have the duty ... when you look at the evidence you don't have any choice but one, if you're really going to do your job.... When you look at the evidence you have no choice. I don't care whether he's twenty years old or twenty-one years old. Billy the Kid was, what, twenty-one years old. *How many more people does James Goforth have to kill before we do what is right?* Do your duty and find him guilty beyond a reasonable doubt .... (emphasis added).

When the complained of argument is viewed in context, it is apparent defendant was not denied a fair trial. *State v. Gilmore*, 681 S.W.2d 934, 944[32] (Mo. banc 1984); *State v. Clark*, 693 S.W.2d 137, 142[22] (Mo.App.1985).

Furthermore, the evidence supports a finding of premeditation and a life sentence without eligibility for probation or parole. It is unlikely the State's comment in closing argument had a decisive effect on the jury's determination. *State v. Stuckey*,

680 S.W.2d 931, 937[10] (Mo. banc 1984); *State v. Reed,* 629 S.W.2d 424, 428–29[6] (Mo.App.1981).

Defendant's second point involves the trial court's refusal to permit defense counsel to argue that the gun shot by Rick Webers during the 1 a.m. fight between defendant and victim should have been subjected to ballistics tests to compare it to the shell taken from the side of a shed at the scene of the murder.

At trial a forensic fire arm and tool mark examiner testified for the State. He conducted comparative analysis between fired bullets and cartridge cases submitted to him by the State and those he fired through defendant's brother-in-law's rifle. He did not conduct tests on Rick Webers' weapon. Defense counsel attempted to argue that the bullet in the side of the shed was from Webers' gun and that its location would show that at 1 a.m. Webers did not fire in the air to stop the fight between defendant and victim, but rather that Webers fired at defendant. The inference suggested by such a scenario, he would presumably have argued, was that defendant was acting in fear and out of self-defense. This inference arguably would rebut the element of deliberation necessary for a conviction for first degree murder.

It has long been held that it is not incumbent upon the State to take a defendant's fingerprints from articles he touched and the defendant may not draw an adverse inference from the fact the State declined to test for fingerprints. *State v. Holmes,* 389 S.W.2d 30, 34[4] (Mo.1965). The same rule applies to other types of tests the State could possibly do. *See, State v. Simpson,* 611 S.W.2d 556, 559–60[13, 14] (Mo.App.1981) (defense cannot argue that the State's failure to test a cap for hair samples implies defendant was framed).

Judgment affirmed.

SATZ, P.J., and KELLY, J., concur.