**STATE of Missouri,
Plaintiff–Respondent,**

v.

**James Henry GREEN,
Defendant–Appellant.**

**James Henry GREEN,
Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 15830, 16747.**

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 31, 1990.

Raymond L. Legg, Columbia, for defendant-appellant and movant-appellant.

William L. Webster, Atty. Gen., Andrea K. Spillars, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SHRUM, Judge.

Defendant, James Henry Green, was convicted by a jury of involuntary manslaughter and sentenced to 7 years pursuant to a jury recommendation. He appeals from that judgment and sentence in Case No. 15830. Defendant filed a Rule 29.15 motion seeking post-conviction relief. The 29.15 motion was denied without evidentiary hearing. Defendant appeals from the order and judgment denying the 29.15 motion. That appeal is Case No. 16747 and was consolidated with the direct appeal from defendant's conviction. The appeals will be dealt with separately in this opinion.

### Case No. 15830

Viewed in the light most favorable to the support of the jury verdict, the evidence in the case was as follows. Defendant lived with his mother Bertha Winget (hereafter Bertha). The victim, Willa Mae Lester (hereafter Mae), defendant's girlfriend, stayed with defendant in Bertha's home on occasion. Defendant, Mae, and Alphonso Penerman spent part of the daylight hours of October 16, 1987, drinking gin at Bertha's house. Alphonso left between 5:00 and 5:30 p.m. Bertha was at home all day but was not drinking. After Alphonso left, defendant and Mae continued drinking gin. Sometime after Alphonso left, Bertha heard defendant and Mae talking loud. Mae wanted to go home but defendant told her she was too drunk to go home. Bertha also said she "guessed" defendant and Mae were arguing, in part, because Mae had moved out for 4 days or so to "Pinky Daniels'" house. While they were in the living room and arguing, Bertha saw defendant slap Mae with his hand. Later, defendant and Mae went to defendant's bedroom where they were heard to be continuing the argument. Bertha had a bedroom separate from where defendant and Mae slept. She went to bed about 8:30 p.m. because she wasn't feeling well. Later in the evening, defendant came to Bertha's bedroom saying, " 'Mother, come here,' ... 'Mae done had a heart attack or something.' " Bertha went to the porch where Mae was lying with her head in the door and her feet out on the porch. Mae was wearing a sweater but was wearing nothing from the waist down. This occurred between 9:00 and 10:00 p.m.

At the time, defendant had a broken leg. His leg was in a cast. Bertha remembered the defendant hopping around, helping Bertha move Mae into the house. Defendant carried Mae by the shoulders and Bertha had her feet. Bertha said she put some pants on Mae after they carried her into the bedroom. Defendant tried to give Mae "mouth-to-mouth" but Bertha could tell that Mae was dead when they put her on the bed. She told defendant, " 'Baby, you better leave her alone. Mae's dead.' " Bertha then went to the living room. Later she called to defendant, telling him, " '[Y]ou better call the sheriff and tell them Mae's dead, so they won't think you killed her.' " Defendant replied, " 'Mother, I'll call in a few minutes. I want to get myself together.' "

The Sikeston Police Department was called, and at 12:54 a.m. on October 17, 1987, Scott County Sheriff's Deputy Ulmer

was requested to go to Bertha's house. When Ulmer arrived at 1:08 a.m., he found Mae lying across the bed. She had dried blood around her nose; she had bruising around her neck; she had a cut above the temple; and she appeared to be unconscious, already deceased. Upon further examination, Ulmer found some bruising on the left side of her face, around the eye; she also had some bruising on the right eye. An ambulance attendant, the Coroner, and Deputy Sheriff Wolsey, all of whom arrived later, noticed the bruising and marks on the victim's body. When Ulmer moved the victim's head, he met some resistance as if rigor mortis had set in.

While Ulmer was making his initial examination, ambulance personnel arrived. The deputy then went to the living room and asked defendant what had caused Mae to be in the condition she was in. Defendant replied that Mae had had a heart attack and had fallen. Defendant further told the deputy, and testified at trial, that he, Mae, and Alphonso had been drinking; and after Alphonso left, defendant and Mae went to bed. He said Mae had needed to go to the bathroom. She got up from the bedroom and headed toward the bathroom but instead of turning right into the bathroom, she turned left. She went into the addition that had been built onto the mobile home, and she went to the porch where she fell off. Because of what he was told by defendant, Ulmer checked the area (in fact, he checked it twice). Each time he found the ground surface around the mobile home to be sandy and damp, but he found no marks where Mae would have landed on the sand. The deputy did not find any blood or marks in the sand near the porch. He found no sand on Mae's body or on her face. Later, Deputy Wolsey's inspection corroborated what Ulmer had to say about the porch, sand, clothing, etc.

While at the defendant's home, Ulmer noted that defendant had a cast on his right leg; he had a cut on his right hand on the index knuckle. The cut, approximately one-half to three-quarter inches long, ap-

peared to be fresh because it was still bleeding. When asked by defense counsel if the cut appeared to be the kind that one could get by hitting someone, Ulmer replied that it was. Ulmer saw blood on defendant's shirt.

A medical technician with the ambulance service determined that Mae was dead upon his arrival at 1:08 a.m. The call received by the ambulance personnel had indicated Mae had had a heart attack, but the attendant described Mae's appearance to be "peculiar to be a heart attack." He saw no dirt, sand, or other foreign substance on her body or clothing. The Scott County Coroner, Scott Amick, examined the body at the defendant's home. He noted bruises about various parts of her body, mostly related to the upper part, around her face and head. There was "a pretty good degree of fixation in the extremities" evidencing rigor mortis. He estimated that Mae had been dead two or three hours.[1]

Deputy Jerry Wolsey arrived at defendant's house at 1:52 a.m. After checking the bedroom where Mae's body was lying, he then checked the back room and porch to see if there was any blood, signs of struggle, or a weapon; he found none of those things at either location. He then returned to the living room of defendant's home where he had a conversation with defendant. Defendant had not been placed under arrest at that time. According to Wolsey, defendant told him that at about 10 p.m., Mae had died from an apparent heart attack and that she fell off the back porch. No other explanation was given to the deputy at that time. The deputy then went back to the bedroom to see if he could find any dirt or sand that might be on Mae's clothing. He found none. Deputy Wolsey then returned to the living room, placed defendant under arrest for investigation of homicide, took defendant outside the house and there advised defendant of his *Miranda* rights. Defendant did not then talk further with the deputy (see footnote 2). He was taken to jail by another deputy.

---

1. He made this estimate as of 1:30 a.m. He had arrived shortly after 1 a.m.

Dr. Gordon Johnson performed an autopsy of Mae's body. He described bruises about her body; these were present in the chin area, on the neck, around the left eye, right eye, bruises on the scalp, bruises up and down both arms, and a large bruise across the upper chest. In the opinion of this pathologist, bruises "appeared to have been formed at about the time of death." He said he concluded the bruises were "immediately associated with the terminal event." In the tissue across the chest and abdomen, the doctor noticed "not just contusions, but hemorrhage, large blood clots in the soft tissue of this area, very fresh-type blood." He found multiple rib fractures, for the most part on the left side, but some very small fractures on the right side. The pathologist opined that the rib fractures were "associated with death. They were right at the time of death." His examination of the heart revealed she had some arteriosclerosis but not severe and the heart musculature was unremarkable. According to the doctor, he "didn't see no heart attacks." He found Mae's left lung was almost filled with blood caused by a rib puncturing or going into the lung. Dr. Johnson concluded that Mae's death was caused by extensive hemorrhage into the lungs and soft tissue due to mechanical injury; i.e., some type of blow, trauma. Because of the distance apart of the injuries, he determined that more than one blow caused the injuries. Dr. Johnson said that, depending upon the temperature at which the body was kept, rigor mortis in the larger muscles should be setting in "easily in four hours to the extent that some resistance could be expected if someone tried to move an arm.

After the pathologist furnished Scott County authorities with some preliminary autopsy information, Wolsey again talked with defendant after advising him of his *Miranda* rights. Deputy Wolsey then said to defendant:

A. I advised him—I said it appeared to myself that things went a little too far between himself and the victim, Ms. Lester.

Q. What did he say in response, if anything?

A. He bowed his head and said "Yes, things went a little too far."

All questioning then stopped because defendant asked for an attorney to be present. Defendant told Wolsey in an earlier conversation that he had gotten the cut on his hand from a broken light in the bathroom.

Dr. Robert Alvin, specializing in pathology, was called by defendant. In his opinion, Mae died from her injuries, with a possible contributing factor being her intoxication. Defendant testified that on the day of Mae's death, he had a cast on his leg, reaching to his knee. He said Mae had come to his house the day before October 16, 1987. She had been gone 3 or 4 days when she came back. Mae had fixed defendant's lunch on October 16, 1987. Later, after lunch, defendant said they started drinking and spent the afternoon drinking gin. In the evening, after the Channel 12 News, he and Mae went to bed. He said she had to go to the bathroom and when she didn't return to the bedroom, defendant went looking for her. He found her lying outside in front of the steps. Defendant picked her up, and then he called his mother, Bertha, and she helped take Mae back into the bedroom where they laid her across the bed. According to defendant, when he found Mae, she had on a black short sweater but nothing else. He said he put a pair of pants back on Mae after he and his mother carried her into the bedroom. Defendant tried to give her mouth-to-mouth resuscitation but came to believe Mae was dead. Defendant said he then went back to the living room and called law officials.

█ In Point I, defendant claims the trial court erred in allowing the State to present evidence of defendant's "post-arrest silence and [his] assertion of his right to legal counsel ... because such evidence violated [defendant's] constitutional right against self-incrimination...."[2] There exists a

2. Q. [To Deputy Wolsey] At that time, did you make any arrest or place anybody into custody?

long-standing rule that "[A]n accused's failure to volunteer an exculpatory statement is not admissible as an admission * * *. The admission of such evidence constitutes an invasion of an accused's constitutional rights." *State v. Mathenia*, 702 S.W.2d 840, 842 (Mo. banc 1986), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Stuart*, 456 S.W.2d 19, 22 (Mo. banc 1970); *State v. Starks*, 459 S.W.2d 249, 251–52 (Mo.1970), citing *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). As pointed out in *State v. Starks*, *supra*, at 252, the mandate laid down by Miranda is that the prosecution may not use the fact that the defendant "stood mute" or claimed his privilege *in the face of accusation*. The rule was further delineated in *State v. Nolan*, 595 S.W.2d 54, 56 (Mo.App.1980) as follows: "The state may not use [post-arrest] silence as [1] affirmative proof or [2] to impeach the defendant's testimony." Examination of the record in this case does not reveal that reference to defendant's post-arrest silence was used as "affirmative proof" or "to impeach" the

defendant. *See State v. Mathenia, supra,* at 842. This record is more like that in *State v. Battles*, 357 Mo. 1223, 1228, 212 S.W.2d 753, 756–57 (1948). There, one of the arresting officers pursued the defendant after he broke away and ran. Defendant ran until he bumped into a "No Parking" sign and fell down. The officers arrived and held defendant. At trial, the officer was asked, "Did the defendant make any statement there ... ?" *Id.* 212 S.W.2d at 756. Defense counsel objected that it was an invasion of defendant's constitutional right of no comment. The police officer's answer was: " ... [A]fter he hit the post, we asked him if he was going to lay still; he said yes, he would lay still. *That was the only statement he made laying there in the street....*" *Id.* at 757 (emphasis added).

The Missouri Supreme Court rejected the claim that this violated defendant's right against self-incrimination, saying:

> *[T]he appellant was not asked about the crime or was anything said about the crime in his presence by anyone.* The only thing asked him was whether

A. I returned back to Mr. Green, who was still sitting in the front living room ... I placed Mr. Green under arrest for investigation of homicide.

Q. At that time, did you physically take him someplace or did someone else take him?

A. Myself and Mr. Green stepped outside his trailer, and at that point I advised Mr. Green of his *Miranda* rights.

Q. Did you do that by way of reading either from something or by memory?

A. By memory.

Q. Did he talk with you at all after having had those *Miranda* rights read to him?

A. No, sir.

* * * * * *

Q. [To Deputy Wolsey] As a result of receiving a preliminary autopsy information, did you feel that there was a possibility that a crime had been committed?

A. Yes, sir.

Q. And you made efforts then to talk with Mr. Jim Henry Green?

A. Yes, sir.

Q. About what time did that conversation occur?

A. It was sometime after six o'clock that evening, between six and seven p.m. of the evening of the 17th of October.

Q. Prior to talking with him on that occasion, did you advise him of any specific rights or acts?

A. Yes, sir, I did.

Q. How did you do that?

A. I advised him his rights from off a *Miranda* pad that we have at the Sheriff's Office.

* * * * * *

Q. [To Deputy Wolsey] After having gone through that, did you and Mr. Jim Henry Green have a conversation about the events that had occurred on October 16 and 17 of 1987?

A. Yes, sir.

Q. What conversation did you have?

A. I told Mr. Green what I suspected happened there at his residence.

Q. Did he make any comment to you or any statements?

A. I advised him—I said it appeared to myself that things went a little too far between himself and the victim, Ms. Lester.

Q. What did he say in response, if anything?

A. He bowed his head and said, "Yes, things went a little too far."

Q. But he continued the conversation with you at that time?

A. After making that comment, he then asked for an attorney to be present with him, and I ceased all questioning at that point.

MR. SUMMERS: That's all the questions I have.

he would lie still, to which he answered in the affirmative, and made no other statement. Certainly, appellant could not be prejudiced under these circumstances. Suppose that when a defendant was arrested he asked the arresting officer to telephone his wife and tell her he was arrested. Certainly this fact would not prejudice the arrested person.

*Id.* at 757 (emphasis added). Similarly, in *State v. Starks*, 459 S.W.2d 249, defendant was convicted of tampering. When arrested, and following *Miranda* warning, the officer questioned defendant about some guns and the defendant answered. At that point, in the direct examination of the arresting officer, he was asked: "Did he [defendant] say anything further?" The officer responded, "No sir, that is all he would say." *Id.* at 251–52. Claims that such question violated defendant's right to remain silent were rejected, with the court saying:

> In the case before us the officer did not accuse Starks of the crime of tampering with the automobile and Starks was not questioned with reference thereto.... This is not a case where an accused clams up in the face of a charge of guilt, *made under circumstances calling imperatively for an admission or denial.* Starks did not "say anything further"—that was all he had to say—because the subject was dropped; the inquiry was ended; no further questions were asked; the subject of tampering was not broached, and both the officer and Starks fell silent while awaiting the arrival of other police officers.

*State v. Starks, supra,* at 252 (emphasis added).

The record here does not reveal a case where the defendant clammed up in the face of a charge of guilt made under circumstances calling imperatively for an admission or denial. Defendant, prior to his arrest, had told the officers of his belief that Mae had had a heart attack and fallen from the porch. That was what he testified to at the time of trial. The record reflects that once the deputy read defendant his *Miranda* rights at defendant's home, inquiry was ended. No further

questions were asked. There was nothing in the record to indicate that, while at the home and following his arrest, defendant was further questioned about the incident and then chose to stay silent. Rather, the record indicates that the officer and defendant had no further discussions immediately following the arrest, either about the homicide accusations or anything else. All that appears, is that the officer and defendant fell silent. A different officer took defendant to jail and Deputy Wolsey remained to gather evidence from the bedroom. Under the circumstances, and in the context in which it was uttered, no inference of guilt of the crime could reasonably have been drawn from the officer's answer that defendant did not talk with him "after having had those *Miranda* rights read to him." *State v. Starks,* 459 S.W.2d at 252–53. This distinguishes this case from *State v. Stuart,* 456 S.W.2d 19, where the sufficiency of the State's case depended upon accused's recent unexplained possession of the stolen property. Here, this record in no way bespeaks the use of defendant's post-conviction silence as affirmative proof of the State's case. Point I is ruled against defendant.

■ Defendant's Point I claim is rejected for another reason. The rule against admissibility of post-arrest silence of the defendant does not apply if the accused chooses to waive his Fifth Amendment privilege by making statements while he is in custody. *State v. Mathenia,* 702 S.W.2d at 842; *State v. Baker,* 791 S.W.2d 939, 942 (Mo.App.1990); *State v. Frentzel,* 717 S.W.2d 862, 866 (Mo.App.1986). Defendant did not here stay silent, either while in custody or at trial. Following his arrest at his home, and after receiving the *Miranda* warnings on more than one occasion, defendant voluntarily talked with Deputy Wolsey. This took place at the jail during the afternoon and evening of October 17, 1987. There was more than one conversation by defendant with Wolsey at the jail. At trial, Deputy Wolsey testified about those conversations. The statements made by defendant at the jail included a reiteration of his pre-arrest claim that Mae had gotten up

to go to the bathroom, did not return, and defendant found her outside, and that he believed she had had a heart attack and had fallen from the porch. It also included defendant's statement that "things went a little too far." Given the fact that no questions were asked and no accusations were made at the time of his arrest (other than the fact that he was placed under arrest), the initial inquiry by Wolsey of defendant's silence at the time of his arrest was merely preliminary to admission into evidence of the later statements by defendant to Deputy Wolsey. *State v. Mathenia,* 702 S.W.2d at 842. The State was entitled to show that the defendant's statements were made voluntarily and that he had been clearly advised that he was not obliged to make any statement. *State v. Stuckey,* 680 S.W.2d 931, 938 (Mo. banc 1984). Whatever complaint defendant might have had concerning the deputy's testimony about defendant's silence after receiving the *Miranda* warning "was invalidated by the subsequent showing by the State that the defendant, after again receiving the *Miranda* warnings from Officer [Wolsey], gave a statement" to Wolsey about the events of the evening of Mae's death. *State v. Baker,* 791 S.W.2d at 943. Also, *see State v. Stuckey, supra; State v. Frentzel, supra; State v. Van Doren,* 657 S.W.2d 708, 716 (Mo.App.1983); *State v. Harper,* 637 S.W.2d 342, 345 (Mo.App. 1982); *State v. Gilreath,* 643 S.W.2d 274, 277 (Mo.App.1982); *State v. Trice,* 575 S.W.2d 739, 742 (Mo.App.1978), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2891, 61 L.Ed.2d 316 (1979). Defendant's initial post-arrest silence was clearly admissible since he subsequently waived his right to remain silent by making the statements to Deputy Wolsey. *State v. Baker, supra.* Defendant's corollary argument—that his invocation of the right to counsel was the functional equivalent of post-arrest silence—is not sound because defendant had already waived his right to be silent by telling the officer that "things went a little too far." Defendant elected to speak; he waived his right to remain silent. After he made the statement ("things went a little too far"), he then declined to speak further, requested a lawyer and questioning stopped. The statement, "things went a little too far," may have been an admission of guilt; it was for the jury to decide. *State v. Sproling,* 752 S.W.2d 884, 888–89 (Mo.App.1988). Point I is ruled against defendant for this additional reason.

▆ Finally, this court notes that at trial the questions which defendant complains of in Point I[3] and the answers to those questions were never objected to. No request was ever made by trial counsel that the trial judge order the jury to disregard the questions and answers nor was a mistrial sought. Under such circumstances, it has been held that any claim of error is waived. *State v. Delgado,* 774 S.W.2d 549, 550–51 (Mo.App.1989). Generally, a litigant must make his request for action or ruling which he believes to be called for when the occasion for it first appears or the claimed error is waived. *State v. O'Dell,* 649 S.W.2d 504, 507 (Mo. App.1983). Such request did not here occur. Defendant urges that it was plain error which was sufficiently prejudicial to require a mistrial, even if no objection was made, citing *State v. Benfield,* 522 S.W.2d 830, 835 (Mo.App.1975). However, in *Benfield, supra,* at 834 (emphasis added), the questions and answers were:

> Q. Did he [defendant] make any statements?
> A. No.
> Q. At that time?
> A. No, he did not.
> Q. *Did he make any statements to your knowledge at any other time?*
> A. No.

The facts in this case are clearly different. Here, defendant did make subsequent statements. In fact, defendant's counsel cross-examined officer Wolsey in detail about four conversations[4] between Wolsey

---

3. See footnote 2.

4. Q. [By defense counsel] In the first statement you talked to him about it. What did he tell you happened?

and defendant, one at the house and three at the jail after he was arrested. Defendant's counsel did not object to the questions about defendant's silence; further, he joined the State during cross-examination in bringing out the fact that in defendant's second statement, made at the jail after his arrest, he continued to claim that Mae died of a heart attack. It is reasonable to assume that trial counsel, as a part of trial strategy, chose not to object to the testimony about defendant's silence, but instead desired it to be used as a part of the ongoing position of defendant that he believed Mae died of a heart attack. *State v. Mandina*, 541 S.W.2d 716, 719 (Mo.App. 1976). Here, the State had a sufficient case based upon the testimony of defendant's mother, Bertha, sheriff's deputies, pathologist Johnson, and other witnesses to convict defendant. In such case, the rule of *State v. Stuart* with respect to plain error is not controlling. *Mandina, supra*, at 719; *State v. Turnbough*, 497 S.W.2d 856, 859 (Mo.App.1973). Defendant's claim of error in Point I was waived. *State v. Delgado, supra*, at 551. Plain error review under Rule 30.20 is not appropriate as this court finds no prejudice from this evidence and cannot say from the record that manifest injustice or miscarriage of justice resulted. *State v. O'Dell, supra*, at 507–508. Point I is denied.

In Point II, defendant claims the State failed to prove, beyond a reasonable doubt, the corpus delicti or the criminal agency of defendant in causing the death of the victim. It is a challenge to the sufficiency of the evidence to support the defendant's conviction for manslaughter. In this case, no motion for new trial was filed. In a jury tried case, allegations of error to be preserved for appellate review must be included in a motion for new trial except that questions authorized by Rule 27.07 to be presented by a motion for judgment of acquittal (which include questions of sufficiency of evidence) need not be included in a motion for new trial. Rule 29.11(d). Nothing is preserved for appellate review when defendant fails to file a timely motion for new trial. *State v. Hanes*, 729 S.W.2d 612, 615 (Mo.App.1987). Nevertheless, this court reviews for plain error. Rule 30.20.

In a homicide case, the corpus delicti consists of two elements: (1) the death of the person alleged to have been murdered, and (2) the criminal agency of someone other than the deceased causing the death. *State v. Howard*, 738 S.W.2d 500, 504 (Mo.App.1987). Without again reviewing the facts as set forth at the outset of this opinion, this court finds that there was ample evidence to support defendant's conviction. The cause of death was estab-

A. [Deputy Wolsey] He stated the victim, Ms. Lester, had died around ten p.m. on the evening of the 16th from an apparent heart attack.

\* \* \* \* \* \*

Q. And you had another conversation with him how long after that?

A. I believe approximately five o'clock.

Q. Where was Mr. Green from the period of two o'clock to five o'clock?

A. In the office there at Scott County Jail.

\* \* \* \* \* \*

Q. What was his story the second time that you talked to him?

A. The same that he gave me the first time.

\* \* \* \* \* \*

Q. Did you make any notes when you talked to Jim Henry—

A. Yes sir.

\* \* \* \* \* \*

A. Can I look at it?

Q. Sure.

A. This here was at 5:15 a.m., 17th of October.

Q. That's the third time you talked with him; right?

A. Yes, sir.

\* \* \* \* \* \*

Q. ... You had one more conversation with him, didn't you, other than what we have just previously talked about on your notes here?

A. At around 6:55 p.m. on the evening of the 17th.

\* \* \* \* \* \*

Q. That was the fourth conversation. Did you put the time down on that?

A. No, sir.

Q. Do you show on there who said what?

A. This is what the defendant responded to.

Q. What did you ask him? What specifically did you say to him?

A. I told him, I said it appeared that things went a little bit too far between him and the victim, Ms. Lester.

lished by the testimony of the pathologist, Dr. Johnson, and the evidence supplied by his testimony was sufficient to support a finding that Mae died as the result of an assault which was the criminal agency of someone other than the deceased. *State v. Howard*, 738 S.W.2d at 502. Further, there was in this case, both direct and circumstantial evidence sufficient to enable a jury to conclude, beyond a reasonable doubt, that the defendant's criminal agency was the cause of Mae's death. The fact that (a) the victim was with defendant throughout the day of her death; (b) they were drinking; (c) they argued; (d) defendant slapped Mae once during the evening hours; (e) defendant woke his mother telling her of Mae's "heart attack" and at the time Mae was lying on the back porch "with her head in the door;" (f) Mae had several visible bruises around her neck, a black eye, cut above her temple, dried blood around her nose and mouth; (g) Mae had been active during the day, fixing defendant's lunch and participating in an afternoon of drinking with defendant and Alphonso; (h) defendant had a fresh cut on his right index knuckle; (i) defendant had a cast on his right leg with which he could have stomped Mae; (j) and the fact that the pathologist testified that Mae died from extensive hemorrhaging into the lungs caused by some type of blow or trauma and that she had died within minutes to one hour after receiving the blow, were sufficient to establish defendant's criminal agency, and therefore, sustain a conviction of him for involuntary manslaughter.[5] Support for this view is found in *State v. Abercrombie*, 694 S.W.2d 268 (Mo.App. 1985); *State v. Bullington*, 684 S.W.2d 52, 57 (Mo.App.1984); and *State v. Applegate*, 668 S.W.2d 624 (Mo.App.1984). Point II is denied. The judgment of the trial court is affirmed.

### Case No. 16747

Point III pertains to the Rule 29.15 appeal. Defendant claims the motion court erred in denying his motion for post-conviction relief without evidentiary hearing "by

failing to make findings with respect to appellant's allegation of defense counsel's failure to interview and call a potential defense witness contained in appellant's *pro se* Rule 29.15 motion." This point is without merit and is denied.

Defendant's pro se motion reads, in pertinent part, as follows:

8. State concisely all the grounds known to you for vacating, setting aside or correcting your conviction and sentence:

(a) Cast on right leg is the alleged murder weapon yet no blood traces were found on cast. No signs of a struggle were found. Defendant was disabled and had to use crutches to move about.

(b) No witness to the crime.

(c) Autopsy proved victim was intoxicated and inebriated, supporting defendants [sic] contention that victim suffered injuries as a result of a fall while in a drunken stupor.

9. State concisely and in the same order the facts which support each of the grounds set out in (8), and the names and addresses of the witnesses or other evidence upon which you intend to rely to prove such facts:

(a) Defendant had, earlier, suffered a fracture of the lower right leg near the ankle and could not bear his own weight without the use of a crutch. A Dr. Adam M.D. specializing in orthopedics will cooberate [sic].

(b) There were no eye-witnesses to the alleged crime.

(c) Autopsy coincides with testimony that victim was intoxicated and inebriated after a night of heavy drinking. This testimony Alphonso Penerman and sworn statement Bertha Winget, deceased.

 In the argument portion of his brief defendant says the trial court erred in denying defendant's 29.15 motion "when [defendant] alleged that trial counsel failed to interview and call a known witness, Dr.

---

**5.** Section 565.024.1, RSMo 1986, reads: "A person commits the crime of involuntary man-

slaughter if he: (1) Recklessly causes the death of another person...."

Adams." Both Point III and the foregoing argument are frivolous. Clearly, defendant did not allege trial counsel error for failure to call Dr. Adams. The motion court did make findings and conclusions as required by Rule 29.15(i) [6] on all issues raised by the post-conviction motion. The motion court was not required to make findings and conclusions on issues not pleaded and not raised by the defendant's motion. Issues not raised in a post-conviction relief motion are waived and cannot be raised on appeal. *Pines v. State,* 778 S.W.2d 724, 725, n. 1 (Mo.App.1989); *Wells v. State,* 621 S.W.2d 553, 554 (Mo.App. 1981). Point III is ruled against defendant in Case No. 16747.

Judgment affirmed.

FLANIGAN, C.J., and PARRISH, P.J., concur.

---

**6.** Rule 29.15(i), in part, reads: **Findings and Conclusions, Issued, When—Judgment.** The court shall issue findings of fact and conclusions of law on all issues presented, whether or not a hearing is held, within thirty days of the submission of the case....