**STATE of Missouri, Respondent,**

v.

**Francis Guy PULIS, Appellant.**

**No. 17289.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 8, 1992.

Jim McNabb, Marshfield, for appellant.

William L. Webster, Atty. Gen., Robin H. Grissom, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Francis Guy Pulis ("Defendant"), tried as a persistent offender, was found guilty by a jury of an attempt, § 564.011,[1] to commit burglary in the second degree, § 569.170, and sentenced by the trial court to three years' imprisonment.

Defendant appeals, claiming (1) the evidence failed to show he attempted to enter a "building," and (2) the trial court erred in receiving evidence that Defendant refused to respond when the arresting officer asked why he ran from the scene of the alleged crime. We synopsize only the evidence pertinent to those contentions.

On May 12, 1989, the Greene County Farmer's Sales Association was occupying a building at the corner of Lyon Avenue and Commercial Street in Springfield, where it sold feed, fertilizer and farm supplies at retail. Attached to the west side of the building was a "greenhouse" containing plants and flowers which the Association sold each spring. The greenhouse was the site of Defendant's alleged attempted burglary. A photograph of the greenhouse, received in evidence as State's Exhibit 2, appears at the end of this opinion.

The Association's general manager testified the greenhouse was erected annually about the last of March and disassembled the last of June. It is constructed of "two-by-fours with poultry netting stretched over it and then a six-mil clear plastic was put over that." The manager explained, "[W]e bolt it into the main building with

1. References to statutes are to RSMo 1986 unless otherwise indicated.

two-by-fours." According to the manager, the greenhouse is 20 feet wide (the east/west dimension) and 35 feet long (the north/south dimension). The manager added, "[O]n the north side we had a door, and we lock it from the inside with a bolt and pin, and then on the south side door ... we had a ... normal lock ... just an outside lock." The manager's testimony continued:

Q ... as far as selling the plants, where was the cash register located on where you sold the plants out of this greenhouse?

A In the main part of the store.

Q Okay, what was the procedure on if somebody wanted to buy a plant, did they come into the main part and pay for it?

A Get a ticket and then one of the boys in the back got their plants for them in the greenhouse.

About 9:00 p.m., May 12, 1989, Corporal Lori Everett of the Springfield Police Department was patrolling in an unmarked vehicle near the Association's place of business. She noticed Defendant near the greenhouse. He saw her, altered his direction, and proceeded south to Commercial Street.

Everett remained in the area. Within a short time, she exited her vehicle and went to the north door of the greenhouse. It was locked, and the plastic and wire were intact.

Everett continued to maintain surveillance in her vehicle. Eventually, she saw Defendant run to the north door of the greenhouse. She testified, "As soon as he got to the north door he dropped to his knees and started fumbling, it looked liked [sic] he was prying on the door."

Everett radioed for additional officers, then drove toward Defendant. He "stood up, looked at the car and took off running south out of the lot." Everett pursued in her vehicle.

Other officers joined the chase. Defendant was swiftly apprehended by Patrolman Mike Owen.

Immediately after Defendant was caught, Everett returned to the greenhouse. The plastic in the north door was down and the wire had been cut.

■ Defendant's first point relied on avers the trial court should have granted Defendant's motion for judgment of acquittal at the close of the evidence because the greenhouse was not a "building" within the meaning of § 569.170. That section reads:

1. A person commits the crime of burglary in the second degree when he knowingly enters unlawfully ... in a building or inhabitable structure for the purpose of committing a crime therein.

2. ....

Section 569.010 defines various terms used in chapter 569. "Building" is not defined. However, "inhabitable structure" is defined. Section 569.010(2) reads:

**"Inhabitable structure"** includes a ship, trailer, sleeping car, airplane, or other vehicle or structure:

(a) Where any person ... carries on business or other calling; ...

(b) ....

(c) ... Any such vehicle or structure is "inhabitable" regardless of whether a person is actually present[.]

Defendant maintains: "The thing called a greenhouse in this case which was bolted on the side of [the] Association's main building was not a building. It was an insubstantial assemblage of two by fours, clear plastic, and chicken wire. It was thrown up and torn down.... There is no connection to the soil, no foundation and, finally, no walls or roof."

Obviously, the greenhouse had no shingled roof. However, a part-time employee of the Association described the greenhouse thus: "[I]t's ... two-by-four rafters up there and there was poultry netting on top and on the side with plastic, clear plastic, over that poultry netting." This testimony indicates the greenhouse was covered by a roof of the same type construction as the walls and doors—two-by-fours supporting poultry wire covered by plastic. State's Exhibit 2 (*infra*) appears to confirm this.

Defendant cites one Missouri case in support of his first point, *State v. Scilagyi*, 579 S.W.2d 814 (Mo.App.1979). There, a jury found the accused guilty of burglary in the second degree in violation of § 560.-070, RSMo 1969 (repealed effective January 1, 1979, by "The Criminal Code," Laws of Missouri 1977, S.B. 60, § 1, pp. 662–63 and § A, p. 718).[2] The site of the alleged burglary was a "40–foot semi-trailer" used as a carnival office. It was on wheels, enabling it to be moved from place to place with the carnival.

The appellate court declared the conviction could stand only if the trailer was a "building" within the meaning of § 560.-070, RSMo 1969. The court examined a dictionary definition of "building," noting one characteristic was construction designed to stand more or less permanently, covering a space of land, as distinguished from a structure not intended for use in one place. The opinion reasoned that the General Assembly, by specifically including boats, vessels, railroad cars, tents and booths in § 560.070, did not consider such "removable structures or instrumentalities" as falling within the generic term "building." Emphasizing the mobility of the semi-trailer and its lack of a permanent location, *Scilagyi* held it was not a "building" within the meaning of § 560.070, RSMo 1969.

*Scilagyi* distinguished *State v. Ryun*, 549 S.W.2d 141 (Mo.App.1977), which upheld a conviction of burglarizing a mobile home that had remained stationary three years, had been "skirted" from floor to ground to block drafts, and was connected to an electric power line. *Scilagyi* explained:

> This case is distinguishable from … *Ryun* … on the basis of the modification of the structure there involved, designed to make its location to some extent permanent and the fact that it had been located for three years at one loca-

tion and used as the sole dwelling place of its residents.

579 S.W.2d at 819.

In the instant case, the greenhouse was situated at the same address each time it was assembled, and it remained stationary until dismantled. It did not travel from place to place like the semi-trailer in *Scilagyi*. Instead, the greenhouse had a fixed location, as did the mobile home in *Ryun*. It is thus arguable that the instant case is factually closer to *Ryun* than to *Scilagyi*.

However, we need not resolve that issue. In *State v. Gully*, 716 S.W.2d 892 (Mo.App. 1986), this Court pointed out that the General Assembly, in enacting § 569.170 and the other burglary related statutes effective January 1, 1979, added the term "inhabitable structure" (as statutorily defined) with the specific intent to broaden the objects of forcible entry which would trigger the applicability of such statutes. 716 S.W.2d at 894.

Inasmuch as burglary in the second degree as proscribed by § 569.170 can be committed by unlawfully entering *either* a building or an inhabitable structure, we need not determine whether the greenhouse was a "building" if it meets the statutory definition of "inhabitable structure." The latter term, as we have seen, is defined by § 569.010(2)(a) as including a structure where any person carries on business. Such a structure is "inhabitable" regardless of whether a person is actually present. § 569.010(2)(c).

There was uncontradicted evidence that the Association engaged in the business of selling plants and flowers at the greenhouse. Consequently, the greenhouse meets the statutory definition of "inhabitable."

The term "structure" is not defined in chapter 569. We must therefore accord that term its plain and ordinary meaning.

2. Section 560.070, RSMo 1969, read: "Every person who shall be convicted of breaking and entering any building, the breaking and entering of which shall not be declared by any statute of this state to be burglary in the first degree, or any booth or tent, or any boat or vessel, or railroad car in which there shall be at the time any human being or any goods, wares, merchandise or other valuable thing kept or deposited, with the intent to steal or commit any crime therein, shall, on conviction, be adjudged guilty of burglary in the second degree."

*State v. Burnau,* 642 S.W.2d 621, 623[5] (Mo.banc 1982).

"Structure" is defined in *Webster's Third New International Dictionary of the English Language* (Merriam–Webster Inc. 1986) as "something constructed or built" or "something made up of more or less interdependent elements or parts."

The greenhouse was constructed of wooden two-by-fours, poultry wire and plastic sheeting. Its doors were capable of being locked. The Association's part-time employee testified it was the normal practice to lock them "so people wouldn't ... go in and pick up stuff." As best we can determine from State's Exhibit 2, a paved surface (apparently a driveway or parking area) served as the greenhouse floor. Although the greenhouse was not built to last indefinitely or withstand harsh weather, once assembled and anchored to the main building it was immovable until dismantled.

In *State v. Murray,* 630 S.W.2d 577 (Mo. banc 1982), the accused was convicted of burglary in the second degree by unlawfully entering an unleased and unoccupied unit of a shopping center. The Supreme Court of Missouri pointed out that under § 569.010(2), a "structure" in which a business is carried on is an inhabitable structure. The Court stated: "The vacant stall, complete with walls, roof and floor most certainly was a structure. It was separated from the stores on either side by partition walls and its doors were closed and locked." 630 S.W.2d at 580. The Court held that even though the unleased portion was vacant, the owner was engaged in the business of leasing space to prospective tenants, and was thus carrying on that business "at least to some extent" in the unoccupied portion. *Id.*

Here, the greenhouse had a roof, walls and lockable doors, and was situated on a paved surface. Anchored to the main building, the greenhouse was immovable. The Association kept and displayed plants and flowers for sale in it. In that respect, the Association was carrying on business in the greenhouse to a greater degree than the owner of the building in *Murray.*

We hold the greenhouse was an "inhabitable structure" within the meaning of §§ 569.010(2) and 569.170.1. Consequently, knowingly attempting to enter it unlawfully for the purpose of committing a crime therein is burglary in the second degree. That being so, it is unnecessary to decide whether the greenhouse was a "building" within the meaning of § 569.170.1. Defendant's first point presents no basis for reversal.

Defendant's second assignment of error concerns a ruling during the testimony of Patrolman Owen, the officer who apprehended Defendant.

Owen testified that after he handcuffed Defendant, he (Owen) advised Defendant of his "Miranda rights." [3] Then, this:

Q ... did you ask the Defendant if he understood the statements?

A Yes.

Q And what was his response, Officer?

A He just, he nodded twice that he understood them.

Q All right. And then after he nodded twice, and he understood, what did you do?

A Then I read the second question which, is having these rights in mind, do you wish to talk to us now.

Q All right, and what was the response of the Defendant, if anything, to that question?

A It was just an affirmative response. I can't recall if he said yes or nodded again, but it wasn't, I mean, he didn't mind doing it.

Q Now, do you recall any of the questions that you asked the Defendant?

A I just asked him why he was prying on the business door.

Q And what was his response?

A Again, I don't remember if he said he wasn't or exactly what, but he denied doing that.

Q Did you ask him any other questions?

A I asked him why he ran.

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

MR. STEWART [4]: Objection, Your Honor, may I approach the bench?

(The following proceedings were had out of the hearing of the jury:)

THE COURT: Yes, sir.

MR. STEWART: Again, raise the objection to asking the question why did you run and then attempting to enter into evidence a response. I object again at this point.[5]

. . . .

THE COURT: Objection is overruled.

(The proceedings returned to open court.)

Q [By prosecutor] Officer, again, do you recall the second question you asked the Defendant?

A I asked him why he ran.

Q And do you recall the Defendant's response?

A He just wouldn't answer it, yes or no.

Q Did you ask the Defendant any other questions that you recall?

A No.

Q Did the Defendant at any time ask for an attorney?

A No, sir.

Q Did the Defendant at any time ask you, tell you, that he did not wish to answer anymore questions?

A No, I just didn't ask anymore.

Defendant asserts the trial court erred in overruling the objection to Patrolman Owen's testimony that Defendant refused to answer when Owen asked why he ran. Defendant maintains Owen's testimony violated his right to remain silent in that his silence "was employed by the State as an implicit admission of guilt."

Defendant relies on one case, *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986),

cert. denied, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986). There, the Supreme Court of Missouri held an accused's failure to volunteer an exculpatory statement is not admissible as an admission or for impeachment, and receiving such evidence constitutes an invasion of an accused's constitutional rights. 702 S.W.2d at 842[1].

The State responds with *State v. Green*, 798 S.W.2d 498 (Mo.App.1990); *State v. Smart*, 756 S.W.2d 578 (Mo.App. 1988); and *State v. Frentzel*, 717 S.W.2d 862 (Mo.App.1986). Those cases hold the rule against admissibility of an accused's post-arrest silence does not apply if he chooses to waive his Fifth Amendment right against self-incrimination by making statements while in custody. *Green*, 798 S.W.2d at 503[2]; *Smart*, 756 S.W.2d at 580[5]; *Frentzel*, 717 S.W.2d at 866[4]. Once an accused agrees to answer questions, his failure to answer certain inquiries is a fair subject for comment at trial. *Smart*, 756 S.W.2d at 581; *Frentzel*, 717 S.W.2d at 866. Although an accused's waiver of his right against self-incrimination is not irrevocable, it is effective until withdrawn, and if an accused elects to reassert such right he must manifest that decision in some discernable way. *Smart*, 756 S.W.2d at 581.

Here, the uncontradicted testimony of Patrolman Owen [6] was that he advised Defendant of his Miranda rights, Defendant acknowledged he understood them, Owen asked Defendant if he wanted to talk, and Defendant responded affirmatively. Owen then asked Defendant why he was prying on the door. Defendant denied doing it. Owen then asked Defendant why he ran. Defendant did not answer. Owen asked no further questions. Defendant never stated

---

**4.** Defendant's lawyer at trial.

**5.** Earlier, in an "oral motion in limine," lawyer Stewart had requested the trial court to bar Owen from testifying that Defendant failed to answer when Owen asked why he ran. Stewart argued such testimony would violate Defen-

dant's Fifth, Sixth and Fourteenth Amendment rights.

**6.** Defendant did not testify. No one else testified about the in-custody questioning.

he did not want to answer any more questions, nor did he indicate a desire to exercise his right against self-incrimination.

Assuming, without deciding, that Defendant's second point was preserved at trial for appellate review, we hold it is governed by the authorities cited by the State. Accordingly, the point is denied, and the judgment is affirmed.

PREWITT, P.J., and PARRISH, J., concur.