STATE of Missouri, Respondent,

v.

Gloyd W. SHAW, Appellant.

No. WD 49748.

Missouri Court of Appeals, Western District.

Feb. 20, 1996.

Jarrett Aiken Johnson, Assistant Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before BRECKENRIDGE, P.J., and ULRICH and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Gloyd W. Shaw was convicted of three counts of forgery under section 570.090.1, RSMo 1986, after a trial by jury. He was

sentenced to three years imprisonment on each count. Mr. Shaw appeals his conviction on the grounds that: (1) the admission of certain blank checks and carbon duplicates of checks found in his motel room was error because this evidence was the result of an unconstitutional search and seizure; (2) the State improperly questioned and commented on Mr. Shaw's failure to provide information to the police or prosecutors; (3) the admission of statements made by Mr. Shaw to the police was error because such statements were taken in violation of Mr. Shaw's constitutional rights; and (4) the State should not have been permitted to present evidence and testimony as to the blank computer-generated checks found in Mr. Shaw's room and as to other forged checks because it constituted evidence of other uncharged crimes. Finding no prejudicial error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Shaw checked out of his room at the Super 8 Motel in Kingdom City, Missouri on October 22, 1993, planning to catch a bus out of town. Because he missed the bus, he returned to the motel later that day and was checked into a new room.

Shortly thereafter, while the motel housekeeping staff was cleaning Mr. Shaw's first room in order to make it ready for other guests, they discovered a large amount of women's clothing underneath the bed and in the dresser as well as a Bible, photographs, men's clothing and car care products. The motel manager thought it strange that Mr. Shaw, traveling alone, had left these items, and called the police to report a "suspicious person."

Sergeant Larry Dye and Deputy Marla Sweede were dispatched to the motel. They examined the discovered items, which had been removed from the motel room and placed in the manager's office, and then proceeded to Mr. Shaw's new room. Sergeant Dye knocked on the door of the room but there was no response. Hearing "some movement within the room," Deputy Swede returned to the lobby and had the manager telephone Mr. Shaw's room. When there was no answer, the officers unsuccessfully attempted to use a pass key to enter, but discovered they needed a second pass key. Just as Deputy Sweede was returning with the second key, Mr. Shaw opened the door and invited the officers into the room.

Sergeant Dye began questioning Mr. Shaw about the clothes discovered in the room he had previously occupied. According to the officers, Deputy Sweede obtained Mr. Shaw's consent to search Mr. Shaw's bags including a large black duffle bag, a smaller black bag and a small camouflage bag.

During the search, Deputy Sweede discovered a wallet belonging to a "Tim Savage," a name Deputy Sweede recognized as appearing in the Bible which had been found in Mr. Shaw's old room. Deputy Sweede then arrested Mr. Shaw for possession of stolen property and Sergeant Dye read Mr. Shaw his *Miranda* rights. Mr. Shaw indicated that he understood his rights.

After Mr. Shaw was handcuffed and seated in a chair in the motel room, Deputy Swede asked Mr. Shaw if they could search the motel room. Again according to the officers, Mr. Shaw consented and the officers proceeded to search the room. They found a date or address book containing the identification of a "Carol Spiewak" as well as approximately fifteen computer-generated Cheetah Transportation Company ("Cheetah") checks, between the mattresses on the bed. Sergeant Dye was aware that a few days earlier Ms. Spiewak had reported the theft of a large black duffle containing her clothes. The officers also found carbon copies of additional Cheetah checks inside the flush tank of the toilet.

During the search, at the point Sergeant Dye discovered the checks under the mattress, Mr. Shaw said, "That's what you're looking for." While in the patrol car en route to Kingdom City, Mr. Shaw told the officers that he had taken the checks from Robert Cochran in Columbia, Missouri and that he did not want Mr. Cochran to get in trouble because Mr. Cochran was a good guy. Mr. Shaw also told the officers "that he had passed four or five checks at Midway and one at Petro Truck Stop."

Further investigation revealed that the checks found in Mr. Shaw's room had been reported as missing on approximately October 20, 1993, by Mr. Cochran, a freight broker with Cheetah. Mr. Cochran had permitted Mr. Shaw to sleep in his office on a roll-away bed during October of 1993, after Mr. Shaw had told Mr. Cochran that he was low on funds.[1] When Mr. Cochran came to his office on October 20, 1993, he discovered that Mr. Shaw had removed his belongings from the office. Searching the office, Mr. Cochran discovered that a number of checks from Cheetah and Packard Transportation Company were missing.

In addition, an employee of Midway Travel Center testified that Mr. Shaw had presented three checks for payment between October 17 and October 19, 1993. Mr. Cochran identified these checks as Cheetah advance checks—numbers 137282, 137281 and 137150, written for $185.00, $183.00 and $150.00, respectively. Mr. Cochran testified that Mr. Shaw was listed as the payee on each of the checks. Mr. Cochran also stated that, although his own name appeared on the signature line of each of the checks, he had not signed the checks nor had he authorized any of the three transactions. Mr. Shaw was convicted for forging these three checks, carbons of which had been found in the flush tank of the toilet in Mr. Shaw's motel room.

Prior to trial, Mr. Shaw had sought to suppress both the evidence discovered in the motel room and the statements he had made after his arrest. The trial court overruled both motions. He now raises the issues addressed in these motions as error on appeal.

## II. ADMISSION OF THE CHECKS FOUND IN MR. SHAW'S MOTEL ROOM WAS NOT ERROR

Mr. Shaw argues that the evidence discovered in his motel room should have been excluded at trial because the police obtained it through an unlawful search and seizure. This evidence included blank computer-generated checks found between the mattress of the bed and carbons and duplicates of the three forged checks passed by Mr. Shaw found in the flush tank of the motel room's toilet.

### A. Standard of Review.

The Fourth Amendment guarantees the right to be secure against unlawful searches and seizures, *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and is enforceable against the states through the due process clause of the Fourteenth Amendment. *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990). The mandate of the Fourth Amendment is such that any search without a warrant per se unlawful unless it falls within certain narrowly delineated exceptions. *State v. Gilpin*, 836 S.W.2d 49, 52 (Mo.App. 1992). Among the recognized exceptions to the warrant requirement are (1) consent of the individual being searched and, (2) a search incident to lawful arrest. *State v. Greene*, 785 S.W.2d 574, 576 (Mo.App.1990).

A trial court has broad discretion in determining the admissibility of evidence. *State v. Hofmann*, 895 S.W.2d 108, 113 (Mo.App.1995). Appellate review of a ruling on a motion to suppress is limited to determining whether the evidence is sufficient to support the trial court's ruling. *Id.* On review, the appellate court considers the facts and reasonable inferences from those facts in a light most favorable to the trial court's ruling. *Id.* An abuse of discretion will not be found unless the evidence shows that reasonable persons could not differ as to the propriety of the action taken by the trial court. *Id.*

### B. Mr. Shaw Validly Consented to the Search.

Mr. Shaw claims that his alleged consent to the search of his motel room was invalid on two grounds. First, he alleges, he did not consent to the search of anything other than his luggage. Second, he asserts, even if the trial court believed he also consented to a search of his motel room, that consent was invalid because not freely given in that the

---

1. Mr. Cochran first met Mr. Shaw in August, 1993. Mr. Shaw, looking for someone to manage a meat transportation business in Missouri, had offered to pay Mr. Cochran in exchange for the use of office space.

circumstances surrounding the visit of the law enforcement officers to his motel room created an "intimidating atmosphere." As a result, he said, "any consent given . . . could not have been of his free will in light of the actions and statements" of the law enforcement officers.

■ We disagree. The evidence adduced by the State supports the trial court's finding that Mr. Shaw voluntarily consented to the officers' entry into the motel room, to the search of his luggage and to the search of the room.

■ A consent to search is valid only if it is freely and voluntarily given. *State v. Hyland*, 840 S.W.2d 219, 221 (Mo. banc 1992). Consent is freely and voluntarily given if, considering the totality of all the surrounding circumstances, an objective observer would conclude that the person giving consent made a free and unconstrained choice to do so. *Id.* That is what occurred here.

More specifically, Sergeant Dye testified that Mr. Shaw invited him and Deputy Sweede into his room after they identified themselves as law enforcement officers. Deputy Sweede testified that Mr. Shaw consented to the search of his luggage before he was placed under arrest, and Mr. Shaw admitted that this was the case. In searching Mr. Shaw's luggage, the officers found a wallet containing the identification of Tim Savage. As a result, they arrested and handcuffed Mr. Shaw.

At this point, Deputy Sweede testified, she asked Mr. Shaw for consent to search his room. While Mr. Shaw denies he consented to this search, both Sergeant Dye and Deputy Sweede testified that consent was given. It was up to the trial court to determine which rendition of events was more accurate. The court acted within its discretion in resolving the conflicts in the testimony in favor of the officers. *Hofmann*, 895 S.W.2d at 113.

■ Mr. Shaw also contends that, even if he did consent to the search of his motel room, that consent was not valid because it was given after he was arrested and hand-cuffed and while he was in an intimidating atmosphere. In determining whether consent is voluntarily and freely given, we examine many factors including, but not limited to, the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in custody, whether there was any fraud on the part of the officers, and the evidence of what was said and done by the person consenting. *State v. Smith*, 850 S.W.2d 934, 941 (Mo.App.1993).

■ Here, in favor of suppression are the facts that Mr. Shaw was under arrest and was handcuffed at the time of his consent. Voluntary consent, however, is not necessarily precluded merely because Mr. Shaw was in police custody. *State v. Hunter*, 750 S.W.2d 134, 136–37 (Mo.App.1988). If it were, most post-arrest consents would be invalid. Here, there were no additional intimidating circumstances. Only two officers were present, and there was no evidence that the officers had drawn their weapons, that Mr. Shaw had been detained for a lengthy period of time when consent was given or that the officers acted fraudulently towards Mr. Shaw.[2] *Hofmann*, 895 S.W.2d at 113. In addition, Mr. Shaw never requested that the officers stop the search. *Id.* In light of the totality of the circumstances, it was reasonable for the trial court to conclude that Mr. Shaw made a free and unconstrained choice to permit the officers to search his room.

■ Even were the consent otherwise invalid, however, we agree with the State that Mr. Shaw waived any error in admission of the fruits of the search of his room when he admitted, at trial, that he put the pad of check blanks underneath the mattress and that the carbon duplicates were in the bathroom. He thereby testified to substantially the same facts that he attempted to suppress. Mr. Shaw cannot claim to be prejudiced by allegedly inadmissible evidence if he offered evidence to the same effect as the challenged evidence. *State v. Osterloh*, 773

---

2. Mr. Shaw alleges that the officers denied him medical treatment until he made a statement.

This allegation is discussed in Section III., *infra*.

S.W.2d 213, 217 (Mo.App.1989); *State v. Schwendt,* 645 S.W.2d 385, 387 (Mo.App. 1983). As stated in *State v. Tettamble,* 720 S.W.2d 741 (Mo.App.1986):

> If the context of defendant's testimony at trial does not vary materially from the out-of-court statement he seeks to suppress, any error in admitting the out-of-court statement is cured by defendant's in-court confirmation of the statement's truth.

720 S.W.2d at 743.

For these reasons, we do not believe the trial court erred in refusing to exclude the evidence found in Mr. Shaw's motel room.

### III. *THE PROSECUTOR WAS ENTITLED TO COMMENT ON MR. SHAW'S POST–ARREST SILENCE*

Mr. Shaw was given *Miranda* warnings by Sergeant Dye in the motel room before the checks were found under the mattress and the other evidence was found in the bathroom. He did not sign a *Miranda* waiver but he nonetheless made comments to the officers during their search of his motel room and made additional statements to Sergeant Dye after they reached the police station. He never claimed in the course of these comments and statements that he had Mr. Cochran's permission to use the checks the officers found. At trial, however, Mr. Shaw claimed that he did indeed have Mr. Cochran's permission to use the checks.

On cross-examination, the State asked Mr. Shaw why he failed to reveal, prior to trial, that he had permission to use the checks in question. Mr. Shaw replied that he did not have an attorney present, that his attorney had advised him not to talk to anybody and that nobody asked him.

In the opening portion of his closing argument, the prosecutor commented on Mr. Shaw's testimony, without objection by defense counsel, by stating:

> How many times did he miss the opportunity if he was not guilty of this crime to tell somebody before today? He decided to wait to tell you people. He's in jail where deputies work; doesn't tell them. Investigator from our office goes to see him to get a handwriting sample that he

refused to give. You can consider that evidence. Doesn't tell her. This is his chance to say "Hey, look, Bob Cochran said I could sign these checks. And by golly I'm not doing anything wrong." He doesn't do it. He testified that he has been in court 14 times. Hasn't told anybody.

Defendant now claims that the trial court plainly erred in permitting the prosecutor to refer to his post-arrest silence during cross-examination and closing argument.

■ Generally, the State cannot use the silence of an accused, at the time of arrest and after receiving *Miranda* warnings, for impeachment purposes. *State v. Robinson,* 834 S.W.2d 246, 248 (Mo.App.1992). This general rule, however, does not apply if the accused chooses not to exercise his or her right to remain silent and elects, instead, to make a statement while in custody. *State v. Pulis,* 822 S.W.2d 541, 546 (Mo.App.1992); *State v. Smart,* 756 S.W.2d 578, 579–80 (Mo. App.1988). Once an accused agrees to answer questions, his failure to answer certain inquiries is a fair subject for comment at trial. *Pulis,* 822 S.W.2d at 546.

*State v. Anthony,* 857 S.W.2d 861, 868 (Mo.App.1993), is instructive as to how to apply this rule. In that case, the prosecutor cross-examined the defendant about his failure during prior interrogations to explain his whereabouts at the time of the crime. Mr. Anthony testified that he did not tell the detective where he was on the date of the crime because the detective did not ask him. He then argued on appeal that the prosecutor's questions violated his right to remain silent. *Anthony* rejected that argument on the basis that once Mr. Anthony had made some statements, the prosecutor was entitled to comment on his failure to offer exculpatory information later relied on at trial.

■ The same reasoning applies here. Mr. Shaw claimed at trial that he did not provide exculpatory information because he did not have an attorney present and that his attorney had advised him not to answer any questions. Although an accused's waiver of the right to remain silent is not irrevocable, the accused has the burden of showing re-

invocation of the right after a waiver. *Anthony*, 857 S.W.2d at 868. There was no evidence that Mr. Shaw attempted to reinvoke his right to remain silent after waiving this right by making statements to the police. In the absence of such evidence, the court did not err in permitting comment on the fact that Mr. Shaw made some statements but was silent as to this exculpatory information.

■ Mr. Shaw alternatively claims that any partial statements made by him should not constitute a waiver of his right to remain silent because all of his statements were involuntary and coerced by the police, who he alleges refused to provide him with medical treatment unless he made a statement. Mr. Shaw thus argues that the court should not have permitted a negative inference to be drawn from his earlier failure to reveal this information, and further that the trial court erred in failing to suppress the incriminating statements he made following his arrest and in allowing Sergeant Dye and Deputy Sweede to testify about his statements.

If the trial court believed Mr. Shaw's testimony, it should have suppressed his post-arrest statements. § 542.296, RSMo 1986; *State v. Childress,* 828 S.W.2d 935, 939 (Mo. App.1992). Here, however, there was contrary testimony by Deputy Sweede that, although Mr. Shaw complained that his knee hurt, she never heard him request medical treatment for his knee. Sergeant Dye similarly testified that Mr. Shaw did not request medical attention until either just prior to leaving the motel room or in the car on the way to the Sheriff's department, both of which events occurred after he made the relied on post-arrest statements. Sergeant Dye testified that he told Mr. Shaw that they would see about getting treatment for him once they reached the Sheriff's department. He denied telling Mr. Shaw that he would only receive medical treatment if he made a statement.

■ The weight of the evidence and the credibility of witnesses is for the trial court's determination. *Hofmann,* 895 S.W.2d at 113. The trial court, in determining that Mr. Shaw's statements were admissible, chose to believe the testimony of the officers that they did not threaten to withhold medical treatment until Mr. Shaw made a statement.

■ Mr. Shaw also claims that he had not waived his right to remain silent because he refused to sign the *Miranda* waiver form. The statements to which Mr. Shaw objects were made prior to his refusal to sign the waiver form, however. In fact, Deputy Swede testified that, as soon as Mr. Shaw refused to sign the waiver form, she "quit talking to him." Thus, there was no violation of Mr. Shaw's right to remain silent.

## IV. *ADMISSION OF EVIDENCE OF OTHER CHECKS WAS NOT ERRONEOUS*

Mr. Shaw also asserts that the State's presentation of evidence and argument concerning his alleged forging of checks other than those which were the subject of the charges brought against him was error. He further alleges that the introduction of the blank computer-generated checks and testimony regarding these checks was inadmissible evidence of other crimes.

Sergeant Dye testified, over trial counsel's objection, that "at one point" Mr. Shaw stated "that he had passed four or five checks at Midway and one at Petro Truck Stop." In addition, the blank computer-generated checks found between the mattresses of Mr. Shaw's bed were admitted, over defense counsel's objection, as was substantial testimony concerning these blank checks.

■ A criminal defendant has the right to be tried only for the crimes for which he has been charged. *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). Thus, the admission of evidence relating to other crimes or uncharged misconduct is generally prohibited. *State v. Bannister,* 680 S.W.2d 141, 147 (Mo. banc 1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985). Evidence which seeks to demonstrate that the defendant has committed, been accused of, been convicted of or definitely associated with another crime or crimes clearly violates both the letter and the

spirit of the rule. *Hornbuckle,* 769 S.W.2d at 96.

■ There are, however, numerous exceptions to the general rule prohibiting such evidence. Evidence of other crimes may be admissible when it tends to show motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other and the identity of the person charged with the commission of the crime. *State v. Harris,* 870 S.W.2d 798, 810 (Mo. banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

■ The State argues that the evidence of other forgeries was admissible to show intent. Missouri courts have generally found that "the admission of evidence showing that the ... accused[ ] perpetrated similar forgeries near the time and place in question [is] not error." *State v. Boley,* 565 S.W.2d 828, 831 (Mo.App.1978). This evidence may be admitted as evidence of a common scheme or plan of intent to defraud. *See State v. Burnett,* 429 S.W.2d 239 (Mo.1968); *State v. McWilliams,* 331 S.W.2d 610, 613 (Mo.1960); *State v. Hartman,* 364 Mo. 1109, 273 S.W.2d 198, 204–05 (banc 1954); *State v. Elmore,* 796 S.W.2d 631, 634–35 (Mo.App.1990); *State v. Mercado,* 787 S.W.2d 848, 850–51 (Mo.App. 1990); *Boley,* 565 S.W.2d at 831. Here, the evidence he now complains about showed that Mr. Shaw admitted to the officers that he had passed several bad checks also belonging to Cheetah in the previous few days. This evidence was admissible to counter Mr. Shaw's claim that he had permission to use the checks and that he had no intent to defraud, and to show that his possession of the checks was part of a common plan or scheme to defraud Cheetah.

■ Nor was the admission of the blank computer-generated checks and testimony relating to these checks error. Deputy Lane, a witness called by Mr. Shaw, testified that he met with Mr. Cochran on October 20, 1993, concerning "[s]ome missing transportation checks I believe were Cheetah and Packard." Deputy Lane stated that he reported these checks as stolen and that he thought there were six of the Cheetah checks. This testimony was elicited by Mr. Shaw's own counsel on direct examination. On cross-examination, Deputy Lane testified that Mr. Cochran identified several checks missing from the Cheetah account, numbered 137281—137300, without objection by defense counsel. Mr. Shaw cannot object to evidence that was presented by his attorney's own questions. *State v. Middleton,* 854 S.W.2d 504, 516 (Mo.App.1993). Nor can Mr. Shaw complain if the prosecution inquires further into a matter first brought out by the defendant's questioning. *State v. Jordan,* 646 S.W.2d 747, 750 (Mo. banc 1983).

■ Furthermore, Deputy Lane's testimony was essentially identical to the testimony of Mr. Cochran, who stated without objection, that checks from Cheetah and also some checks for Packard Transportation were missing from his desk drawer. Mr. Shaw cannot complain about the admission of testimony over his objection, where similar evidence was admitted without objection. *State v. Griffin,* 876 S.W.2d 43, 45 (Mo.App. 1994). Similarly, there is no prejudice and no reversible error where evidence is improperly admitted, if evidence properly before the court establishes essentially the same fact. *State v. Jones,* 854 S.W.2d 60, 62 (Mo.App.1993). For these reasons, the admission of the blank computer-generated checks and testimony regarding these checks was not reversible error.

For the reasons stated above, we affirm Mr. Shaw's conviction.

All concur.